**In the Matter of NICFUR–CRUZ REALTY CORP., Debtor.**

**Bankruptcy No. 83 B 10949 (JJG) (PBA).**

United States Bankruptcy Court, S.D. New York.

June 11, 1985.

**164**

Togut, Segal & Segal, New York City, for debtor.

Tobin & Stern, Platzer & Fineberg, New York City, for Norman S. Weinstein.

## DECISION ON REQUEST OF SECURED PARTY FOR FEES

PRUDENCE B. ABRAM, Bankruptcy Judge:

On June 24, 1983, Nicfur-Cruz Realty Corp. ("Nicfur" or the "Debtor"), the debtor in this case, filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. At the time of the filing, Nicfur owned two residential buildings located at 241–243 West 109th Street, New York, New York (the "Apartment Buildings"). The Apartment Buildings were encumbered by a wrap-around mortgage running in favor of Norman S. Weinstein in the then principal amount of $160,000 (the "Weinstein Mortgage").[1] A foreclosure action with respect to the Weinstein Mortgage had been commenced in state court in April 1983 and in early June 1983 a receiver for the Apartment Buildings had been appointed. During the Chapter 11 case and in February 1984, the Apartment Buildings were sold for $307,500. A portion of the purchase price was paid by reinstatement of the Weinstein Mortgage and assumption of its obligations by the purchaser.

Weinstein is presently seeking to have this court direct the debtor to pay $25,198.57 in attorneys' fees that he has incurred since he commenced the foreclosure action. Bankruptcy Code § 506(b) provides that, to the extent that the value of the collateral securing a claim is sufficient, a creditor is to be allowed interest on the claim and

> "any reasonable fees, costs, or charges ·provided under the agreement under which such claim arose."

As the Apartment Buildings have been sold for an amount substantially in excess of the Weinstein Mortgage, including interest, charges and the claimed attorneys' fees, it is indisputable that Weinstein is to be treated as a fully secured creditor.

---

**1.** The Weinstein Mortgage Note, dated December 23, 1980, provides for payment of interest at the rate of 11% per annum. It has a maturity date of January 1, 1991. During the time at issue the mortgage provided for payments of $1,466.67, an amount equal to interest only. Neither the mortgage nor the mortgage note contains a due on sale clause. The mortgage provides that it may be prepaid after January 1, 1981 in multiples of $1,000 if 30 days prior notice is given. Prepayment, however, does not alter the monthly payments, which remain the same as previously.

The Weinstein Mortgage wraps around a first mortgage held by James and Norma Alvarez (the "Alvarez Mortgage"). The Alvarez Mortgage in the approximate amount of $45,000 was payable in full by its terms on June 8, 1984. Payments on the Alvarez Mortgage, $458.33 per month until the balloon payment due on maturity, were the obligation of Weinstein pursuant to the terms of the Weinstein Mortgage. ¶ 11 of Rider to Weinstein Mortgage. The Weinstein Mortgage note required Nicfur to make a principal payment of $43,844.43 on May 1, 1984. As the payments under the Weinstein Mortgage note were structured, the payments when made as due by Nicfur were sufficient to enable Weinstein to make all payments due under the Alvarez Mortgage. The Alvarez Mortgage did not go into default until August 1983, when Weinstein ceased making payments. The terms of the Weinstein Mortgage obligated Weinstein to make payments on the Alvarez Mortgage only when payments to him were current. ¶ 13 of Rider to Weinstein Mortgage.

The two law firms who have represented Weinstein have filed detailed applications. Tobin and Stern seeks an allowance in the amount of $10,650 and reimbursement of expenses of $505.92 for services rendered to Weinstein for real estate matters, including the conduct of the foreclosure action and attendance at the February 1984 closing of the sale of the Apartment Buildings. The firm expended 85.2 hours and seeks compensation at the rate of $125 per hour. All of the services, except for 6.9 hours, were performed by Samuel A. Stern, Esq. Platzer & Fineberg seeks an allowance in the amount of $13,950, and reimbursement of expenses of $92.65, for 94.9 expended hours for services rendered to Weinstein in bankruptcy matters. Most of the services were rendered by Henry G. Swergold, Esq., who seeks compensation at the rate of $150 per hour. The firm's mixed hourly rate is slightly less than $150 as approximately 10 hours spent by an associate were billed at $125 per hour.

The Debtor has strenuously objected to being directed to pay these attorneys' fees. Loida N. Lewis, the secretary and a one-third shareholder of the Debtor, has submitted a lengthy affidavit in opposition. The major thrust of the affidavit may be gleaned from the following paragraphs.

"35. Deponent [Loida N. Lewis] respectfully submits that the fee applications submitted by Platzer and Stern are unreasonable in light of the cash presently in this estate and in light of the services performed by both Platzer and Stern.

"36. Moreover, a great deal of the time expended by all counsel involved in this case is a direct result of the intransigence of Weinstein and his unconscionable negotiating tactics.

\*        \*        \*        \*        \*        \*

"56. Deponent believes that the result eventually accomplished in this bankruptcy case could have been achieved at a much earlier date and at a much lower cost had Stern and Platzer negotiated on

Weinstein's behalf in good faith and had those firms not attempted to assist Weinstein in his efforts to regain the Buildings from the Debtor at a 'bargain price'.

"57. In addition, the Debtor is simply unable to pay the two fees requested."

The Tobin and Stern and Platzer & Fineberg firms have submitted affidavits in response to the Lewis affidavit disputing the characterization of various events and the propriety of the conclusions drawn in the Lewis affidavit.

A hearing was held on the two fee applications on August 6, 1984. At the request of Nicfur that hearing was adjourned to August 15 and the Lewis affidavit was submitted at that time. In light of the apparent disputes between the parties over the factual background, the court advised the parties that it was prepared to fix a hearing date at which testimony could be adduced. However, all parties were opposed to any further legal proceedings and requested that the court determine the matter on the basis of the papers submitted and its review of the legal file in the Chapter 11 case.[2] After reviewing the Chapter 11 file, the fee applications, the various affidavits submitted and the relevant legal authorities, the court is satisfied that it can pass on the applications without the necessity for further hearings or testimony.

For the reasons which follow, the court has concluded that the Debtor is obligated to reimburse Weinstein for attorneys' fees in the amount of $13,675.

## DISCUSSION

### The Nature of Reasonable Attorneys' Fees

■ The American rule is that each party must bear its own counsel fees. See *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Variance of this rule occurs only when a statute provides for the awarding of attorneys' fees to the prevailing party, *e.g.*, Bankruptcy Code § 303(i),

---

**2.** This case was assigned to the late Bankruptcy Judge John J. Galgay until his death in May 1984 and thereafter randomly reassigned.

Coincidentally, prior to the reassignment the present judge had twice approved settlement stipulations in Judge Galgay's absence.

or when a contractual provision imposes an obligation to reimburse attorneys' fees. Bankruptcy Code § 506(b), quoted above, is a mixture of these two means of varying the American rule. It authorizes the enforcement in a bankruptcy case of a contractual obligation for attorneys' fees, to the extent such fees are reasonable. See, generally, 3 Collier on Bankruptcy (15th Ed.), ¶ 506.05 at 506–45 to 506–49.

█ The contract here is the Weinstein Mortgage, which does provide for the imposition of attorneys' fees on the mortgagor. The controlling provision reads in pertinent part:[3]

"[t]he mortgagor agrees to bear all expenses (including reasonable attorneys' fees for legal services of every kind) of or incidental to the enforcement of any provisions hereof, or enforcement, compromise, or settlement of any of the collateral pledged hereunder, and for the curing thereof, or defending or asserting the rights and claims of the mortgagee in respect thereof, by litigation or otherwise * * * " ¶ 3 of Rider to Weinstein Mortgage.

During the course of the Chapter 11 case, Weinstein and Nicfur entered into three court-approved stipulations,[4] each of which contained a provision in which Nicfur agreed to the payment of reasonable attorneys' fees to Weinstein. The broadly worded obligation found in the Weinstein Mortgage, and reaffirmed in the stipulations, is the necessary predicate to any fee reimbursement awarded to Weinstein.

█ Difficult questions of whether a fee may be "reasonable" under Code § 506(b) yet not be allowable under state law need not detain us in this case. See, e.g., *In re Masnorth Corp.*, 28 B.R. 892

---

3. This provision is the controlling provision because it is found in a typed rider to the Weinstein Mortgage. See 22 N.Y.Jur.2d, Contracts § 225. The printed form body of the mortgage, which has not been crossed-out, contains a similar clause which provides as follows:

"12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent. per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant."

4. The first stipulation entered into between the parties was dated September 13, 1983 and so ordered on September 29, 1983. Paragraph 4 of this stipulation provides that at the closing of the sale the debtor would cure the mortgage arrears

"including penalties and interest computed from the date of the default to the date of closing, plus all of Weinstein's reasonable costs, expenses and attorneys' fees, which attorneys' fees, if any, may exceed $3,000, out of the cash proceeds of the sale of the Buildings."

Paragraph 5 of the stipulation provided for an even division of the cash proceeds of the sale between Weinstein and Nicfur, after first deducting various expenses, including that portion of Weinstein's attorneys' fees exceeding $3,000. As to the first $3,000 of fees, Nicfur was to pay that amount out of its one-half share of the cash proceeds.

The second stipulation entered into by the parties is dated December 29, 1983 and so ordered the same date. This stipulation, which amended and modified the earlier one provided

"6. The Bankruptcy Court shall review and fix all attorneys' fees due to Weinstein's attorneys, Platzer & Fineberg and Tobin and Stern, which fees shall be paid by the Debtor after Bankruptcy Court approval thereof pursuant to Court order."

The payment provided for in Paragraph 6 just quoted was in lieu of the payment in accordance with paragraph 4 of the prior stipulation, according to Paragraph 3 of the second stipulation.

On February 14, 1984, Weinstein and Nicfur entered into yet a third stipulation, which was so ordered on February 17, 1984. This third stipulation provided in Paragraph 5 that Weinstein's attorneys' fees were "subject to payment as more particularly described in Paragraph 6 of the second stipulation."

(Bankr.N.D.Ga.1983) and 36 B.R. 335 (Bankr.N.D.Ga.1984). New York permits enforcement of contracts providing for payment of reasonable attorneys' fees. The New York cases hold that contractual attorneys' fees are subject to review by the courts on a quantum meruit basis relying on the court's power to supervise the practice of law. See, e.g., *Federal Land Bank v. Ambrosano*, 89 A.D.2d 730, 453 N.Y.S.2d 857 (1982); *Avco Financial Services Trust v. Bentley*, 116 Misc.2d 34, 455 N.Y.S.2d 62, 63 (1982).

■ The requirement of Code § 506(b) that fees be "reasonable" imposes a limitation on the amount of contractually agreed upon attorneys' fees which may properly be awarded by the bankruptcy court in addition to any limitation or consideration that would be placed under state law. This reasonableness requirement mandates that the bankruptcy court consider, among other things, both the policies, purposes and provisions of the Bankruptcy Code.[5]

■ Black's Law Dictionary (Revised Fourth Edition) defines "reasonable" as follows:

> "Just; proper. Ordinary or usual. Fit and appropriate to the end in view. * * Having the faculty of reason; rational; governed by reason; under the influence of reason; agreeable to reason. * * * Thinking, speaking, or acting according to the dictates of reason; not immoderate or excessive, being synonymous with rational; honest; equitable; fair; suitable; moderate; tolerable. * * * "

Reasonable attorneys' fees cannot be gauged only by the lodestar of actual time spent in the rendition of legal services mul-

tiplied by the customary hourly rates. The court's assessment must necessarily encompass an examination of the value of the work product of the particular time expenditures to the client's case. "Efforts put into research, briefing and the preparation of a case can expand to fill the time available, and some judgment must be made in the awarding of fees as to diminishing returns from such further efforts." *DiFilippo et al. v. Morizio*, 759 F.2d 231, 235 (2nd Cir.1985). The many factors which the court must take account have been well-summarized in another, non-bankruptcy opinion:

> "Reasonable attorneys' fees * * * are such as are necessary to accomplish the end sought considering the skill and experience of counsel, the magnitude, complexity and novelty of the litigation, the respective positions of the parties in the litigation and the extent of responsibility legitimately undertaken by counsel." *U.S. v. Bedford Associates*, 548 F.Supp. 748, 751 (D.C.S.D.N.Y.1982).

The court is satisfied that both of Weinstein's law firms performed their services in a professionally competent and efficient manner although there is some duplication deriving from the fact that two firms were involved. Both firms were skilled and experienced in their respective fields. That, however, is not enough to warrant allowance of the fees requested. The services must also be necessary to accomplish the appropriate "end sought."

■ What was the appropriate "end sought" by Weinstein through his attorneys? It was the enforcement of his mortgage in accordance with its terms subject

---

**5.** It is possible to urge that a similar conclusion would be reached in this case based on construing the attorneys' fee reimbursement clause in the Weinstein Mortgage itself. In every contract, the law of New York implies good faith and fair dealing. See *Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977). See also 22 N.Y.Jur.2d., Contracts § 201 at 47. Language in contracts placing one party at the mercy of the other are not favored. Courts therefore view with skepticism literal absolutism in contract construction. See *Tibbetts Contracting Corp. v. O & E Con-*

*tracting Co.*, 15 N.Y.2d 324, 337, 258 N.Y.S.2d 400, 408, 206 N.E.2d 340 (1965). The literal terms of the Weinstein Mortgage would appear to permit recovery of attorneys' fees for "asserting the rights and claims of the mortgagee" and could be argued to cover even wholly unsuccessful enforcement endeavors. Such a result should be precluded by the implication of good faith and fair dealing, either because these principles shade the meanings to be ascribed to the contract words or because the limitation that the attorneys' fees must be reasonable embodies them.

to the applicable law. Pre-bankruptcy, Weinstein was entitled to pursue enforcement of his mortgage after default by means of foreclosure as permitted by state law.[6] Post-bankruptcy, Weinstein was entitled to preservation of the value of his interest in the Apartment Buildings as reflected by the mortgage lien through securing adequate protection from the Debtor and to monitor and participate in the Chapter 11 case to the end that the Apartment Buildings be sold, that the Debtor propose and confirm a plan of reorganization, or that the case be converted to Chapter 7 or dismissed.

■ The Bankruptcy Code allows a Chapter 11 debtor to halt the continuation of a foreclosure action.[7] When the petition is filed, it invokes the automatic stay provided by Code § 362. Thereafter, the Chapter 11 debtor may propose a reorganization plan reinstating the mortgage in accordance with its original terms.[8] The

6. The Debtor has argued vigorously against Weinstein's conduct in commencing the foreclosure over a small default. Weinstein, as a matter of state law, was free to pursue this course of action. In *Graf v. Hope Building Corporation*, 254 N.Y. 1, 171 N.E. 884 (1930), based on facts remarkably similar to those in this case, the New York Court of Appeals permitted a mortgage acceleration to stand, holding:

"Plaintiffs may be ungenerous, but generosity is a voluntary attribute and cannot be enforced even by a chancellor. * * * Here there is no penalty, no forfeiture * * *, nothing except a covenant fair on its face to which both parties willingly consented. It is neither oppressive nor unconscionable. * * * In the absence of some act by the mortgagee which a court of equity would be justified in considering unconscionable, he is entitled to the benefit of the covenant. * * * Defendant's mishap, caused by a succession of its errors and negligent omissions, is not of the nature requiring relief from its default. Rejection of plaintiff's legal right could rest only on compassion for defendant's negligence. Such a tender emotion must be exerted, if at all, by the parties rather than by the court. Our guide must be the precedents prevailing since courts of equity were established in this State. Stability of contract obligations must not be undermined by judicial sympathy." 254 N.Y. at 4, 171 N.E. 884.

The *Graf* decision was not unanimous and Judge Cardozo wrote a strong and reasoned dissent to the opinion. In his dissent he stated:

"When an advantage is unconscionable depends upon the circumstances. It is not unconscionable generally to insist that payments shall be made according to the letter of a contract. It may be unconscionable to insist upon adherence to the letter where the default is limited to a trifling balance, where the failure to pay the balance is the product of mistake, and where the mortgagee indicates by his conduct that he appreciates the mistake and has attempted by silence and inaction to turn it to his own advantage. The holder of this mortgage must have understood that he could have his money for the asking. His silence, followed, as it was, by immediate suit at the first available opportunity, brings conviction to the mind that he was avoiding any act that would spur the mortgagor to payment." 254 N.Y. at 12, 171 N.E. 884.

Although there appears to be an evolving trend in the New York lower courts to adopt the reasoning of Judge Cardozo's dissent, *see e.g.*, *Karas v. Wasserman*, 91 App.Div.2d 812, 458 N.Y.S.2d 280 (3d Dept.1982); *Fairmont Associates v. Fairmont Estates*, 99 App.Div.2d 895, 472 N.Y.S.2d 208 (3d Dept.1984), it cannot be said that Judge Cardozo's dissent is now the law of New York as the matter has not been readdressed by the Court of Appeals nor has it been dealt with by the legislature.

7. The present Chapter 11 is an amalgam of Chapters X, XI and XII of the former Bankruptcy Act and incorporates and expands upon the distinctive features of the previously separate chapters. Of particular interest for the purposes of this case is former Chapter XII which provided for a real property arrangement by a person other than a corporation and which permitted mortgage reinstatements. In the several years immediately preceding the adoption of the Bankruptcy Code, Chapter XII was used on an increasingly frequent basis. Chapter XI, the arrangement chapter, was ineffectual for curing mortgage defaults except by consent because the plan was aimed at unsecured creditors. However, former Chapter X, which provided for corporate reorganizations, could provide effective relief from foreclosure, but access to Chapter X was limited.

8. Bankruptcy Code § 1123(a)(5) provides that a plan of reorganization may provide for its implementation by means of the sale of property of the estate subject to a lien, satisfaction or modification of any lien or curing or waiving of any default. A claim is not deemed impaired under a Chapter 11 plan if, notwithstanding any contractual provision or applicable law that entitles the holder of the claim to demand or receive accelerated payment of the claim after the occurrence of a default, the plan cures any default, whether it occurred before or after the

Bankruptcy Code does not leave the holder of a valid security interest bereft of rights, however. First and foremost among the secured party's rights is the right to seek relief from the automatic stay imposed by Bankruptcy Code § 362. The court may grant relief from the stay (1) for cause including lack of adequate protection of the movant's interest in the debtor's property, see Code § 362(d)(1), or (2) if the debtor does not have an equity in the property and the property is not necessary to an effective reorganization, see Code § 362(d)(2). Adequate protection is a term of art and can be provided in any number of ways. See Code § 361. Adequate protection is intended to result in the realization by the movant of the indubitable equivalent of the movant's interest in the property. A debtor may not use cash collateral, a term defined in Code § 363(a), without either the consent of the secured party or court authorization. See Code § 363(c)(2). If at the commencement of the case, property of the estate is in the hands of a custodian, such as a mortgage foreclosure receiver, Code § 543 compels turnover to the debtor of the property, unless otherwise ordered by the court. See, generally, *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); and *In re Kennise Diversified Corp.*, 34 B.R. 237 (Bankr.S.D.N.Y.1983).

■ As will be seen, Weinstein is seeking over $25,000 in attorneys' fees to protect his $160,000 mortgage on real property with an apparent equity cushion of $75,000 to $140,000, based on a pending sale, when the mortgage went into default over only $1,466.67. It is this substantial disproportion of the fees sought to the amounts involved which, in conjunction with the clear rights, powers and privileges afforded Nicfur by the Bankruptcy Code to avoid foreclosure and deaccelerate the mortgage, causes this court to find Weinstein's claim to attorneys' fees unreasonable to the ex-

tent that it exceeds $13,675. Compare *In re Masnorth*, 36 B.R. 335 (Bankr.N.D.Ga. 1984) (Secured parties' request for attorneys' fees of $38,000 reduced to $15,000 on finding that debt of $450,000 was secured by real property with equity cushion in excess of $100,000 and that creditor's prime reason for objection to debtor's proposed reinstatement was the creditor's dissatisfaction with the 9½% contractual interest rate). It is inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the situation or necessary to preservation of the creditor's interest in light of the legal issues involved.

*The Factual Background*

As the court's legal conclusions are best understood against the factual background of the case, the facts will be reviewed in some detail. It appears that in February 1983 Nicfur's check to Weinstein for $1,466.67 for the monthly mortgage payment was dishonored by Nicfur's bank due to insufficient funds. It is undisputed that the February payment was not made within the 15-day grace period provided in the Mortgage. Nicfur has stated that the dishonor of the check occurred because an error by its bookkeeper in balancing the checking account resulted in Nicfur believing there were sufficient funds in the account to cover the check. For some reason, Nicfur did not learn of the dishonor of the February check immediately. By letter dated March 7, 1983, Nicfur requested that Weinstein redeposit the February check, which Weinstein refused to do. Weinstein also refused to accept the March mortgage payment check and in late March gave notice of acceleration of the mortgage.

It appears from the time records of Tobin and Stern that Weinstein first contacted the firm about a possible foreclosure

commencement of the case (Code § 1124(2)(A)), reinstates the maturity of the claim as it existed before the default (Code § 1124(2)(B)), compensates the holder of the claim for any damages incurred as a result of any reasonable reliance by the holder on such contractual provision or applicable law (Code § 1124(2)(C)) and does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles its holder (Code § 1124(2)(D)).

action on March 20, 1983 and that Weinstein was advised that grounds for a foreclosure action existed, which appears to have been legally correct. See footnote 6. On March 31, 1983 the firm prepared a letter calling in the mortgage. On April 12, 1983, Tobin and Stern prepared a letter returning Nicfur's April check. On April 22, 1983, the firm filed a foreclosure action against the Apartment Buildings on Weinstein's behalf.

Nicfur has made much of Weinstein's purported bad faith in commencing the foreclosure action. In Nicfur's view, Weinstein commenced the foreclosure action because he had learned that Nicfur was negotiating to sell the Apartment Buildings. In light of the applicable New York authorities and the admitted nonpayment, the court has been forced to presume that Weinstein was entitled to commence the foreclosure action. It is simply unnecessary to enter into speculation as to whether Nicfur could have successfully defeated the foreclosure action in state court. Nicfur did not elect to litigate the issues in the state court and superseded the foreclosure action by filing its Chapter 11 petition. In any event, at the time the Chapter 11 petition was filed, Platzer & Fineberg had not yet been retained by Weinstein and the time charges of Tobin and Stern, Weinstein's real estate attorneys, were only $3,675 for 29.4 hours, a mere 14.6% of the total legal fees sought. An overwhelming percentage, 85.4% of the $25,198.57 total in fees sought, arise from services rendered after the Chapter 11 petition was filed.

The pre-bankruptcy period is of interest principally for the indications it offers of the financial "stakes" the two sides thought were involved and the outstanding personality disputes. In April 1983 and continuing until early June, Nicfur and Weinstein engaged in settlement negotiations which never bore fruit. Apparently several different proposals were discussed in May and early June. One proposal involved an immediate payment to Weinstein

of $5,000 to be applied to reduce the principal balance of the mortgage and an increase of the interest rate or the rate from 11% to 12%, plus payment of arrears and $4,500 for a rent adjustment and attorneys' fees.[9] Another proposal involved a deed in lieu of foreclosure to a new corporation in which Weinstein and the Nicfur shareholders were to own the stock. Yet another proposal involved payment of arrears, interest, penalties, attorneys' fees and a paydown on the mortgage in an undetermined amount, apparently to be an amount somewhat in excess of the $10,000 the debtor then had on hand.

Nicfur engaged several different attorneys in this pre-bankruptcy period. Weinstein asserts, and the court accepts, that the settlement discussions never bore fruit, because at least in part, the three Nicfur shareholders were never in attendance together at the settlement discussions and those present lacked authority to enter into a binding settlement. In fairness to Weinstein, it should be noted that annexed to the Lewis Affidavit is a copy of a June 3, 1983 letter from Nicfur's then attorney to two of the Nicfur shareholders conveying Weinstein's latest offer and characterizing it as "a reasonable offer and possibly even a generous one."

The Weinstein Mortgage expressly entitles the holder, in any foreclosure action, to the appointment of a receiver. On June 1, 1983, Weinstein secured an order appointing Edward M. Grushko as receiver of the rents, issues and profits of the Apartment Buildings. Mr. Grushko qualified as receiver by filing a $35,000 bond on June 17, 1983 and took over the operation and management of the Apartment Buildings.

On June 16, 1984, Nicfur had entered into a contract to sell the Apartment Buildings to 63 Associates, Inc., who ultimately did consummate the purchase of the Apartment Buildings in February 1984. The purchase price in the contract was for $300,-000, of which $75,000 was to be paid in cash, $65,000 in the form of a purchase

---

**9.** The exact details of the settlement proposals are not material. The court's version of the settlement discussions has been drawn from the Tobin and Stern time records.

money mortgage and the balance of $160,000 by assumption of the Weinstein Mortgage. Nicfur had purchased the Apartment Buildings from Weinstein in December 1980 for only $185,000, including the $160,000 Weinstein Mortgage.

Eight days after entering into the contract with 63 Associates and on June 24, Nicfur commenced this Chapter 11 case. As indicated before, the legal rules governing Weinstein's rights altered dramatically when Nicfur filed its Chapter 11 petition. The Weinstein Mortgage, it should be remembered, was entered into after the Bankruptcy Code was adopted and therefore the parties contracted with reference to its existence. As matters stood after the filing of the Chapter 11 case, it is apparent that

(1) Nicfur was entitled to a turnover of the Apartment Buildings from the receiver.

(2) Weinstein could insist that the rents from the Apartment Buildings be used only for the expenses of operation of the Buildings or for mortgage or real estate tax payments.

(3) The foreclosure action was stayed.

(4) Weinstein would be unable to obtain modification of the § 362 stay because of Nicfur's apparent equity in the Apartment Buildings evidenced by the June 16 contract of sale.

(5) Nicfur could reinstate the Weinstein Mortgage in a plan of reorganization and sell the Apartment Buildings subject to the reinstated Weinstein Mortgage.

A realistic evaluation of Weinstein's situation on the filing date would have to reflect that it was highly likely that so long as the Debtor moved with reasonable diligence to consummate the pending sale the foreclosure would be averted. The wind was plainly out of Weinstein's sails. Weinstein through his attorneys did not take the somewhat passive role this analysis suggests was appropriate. Weinstein did not

bide his time until it became clear whether the Debtor would continue to experience smooth sailing. The major shoal in the water threatening the Debtor appears to have been the difficulty, if not outright impossibility, of imposing reinstatement and deacceleration of the Weinstein Mortgage except pursuant to a plan of reorganization.

From the outset of the Chapter 11 case, Weinstein appears, from a review of his counsel's time records,[10] to have been seeking a way around the anticipated outcome of reinstatement of his mortgage. Weinstein had a strong economic motive to attempt to find the proverbial "loophole", which he needed because the mortgage did not have a due on sale clause. The contract of sale the Debtor had entered into in June 1983 would have left the Debtor with $75,000 in cash, less whatever was required to cure arrearages, as well as the purchase money mortgage and left Weinstein with a reinstated $160,000 mortgage not due until 1991 bearing interest at 11%.

After the filing of the Chapter 11 petition, Weinstein and Nicfur engaged in negotiations over several months which resulted in a stipulation dated September 13. See footnote 4. In the September 13 stipulation, the Debtor acknowledged the validity of the Weinstein Mortgage and Weinstein agreed that the Debtor could sell the Apartment Buildings subject to the Weinstein Mortgage. The stipulation also provided a time schedule for the sale and a mechanism for the division of the cash proceeds of the sale. The Debtor agreed to cure the Weinstein Mortgage arrears, including penalties and interest computed from the date of default to the date of closing. In addition, it was agreed that sale subject to the Weinstein Mortgage and the payments outlined constituted adequate protection to Weinstein. It was also agreed that the Debtor would file an application to permit the receiver to continue in

---

10. For example, Platzer & Fineberg spent over 5 hours researching the acceleration at the outset of their retention. Five hours is not required for experienced bankruptcy counsel to determine that reinstatement is a likely outcome. That much time could be consumed only by an effort to determine how deacceleration and reinstatement might be prevented.

possession, custody and control of the Apartment Buildings.[11] An order permitting the receiver to continue in possession was signed by the Bankruptcy Court on October 20, 1983. Prior to that date and on October 7, 1983, a hearing was held on Nicfur's application for approval to sell the Apartment Buildings which resulted in bidding increasing the purchase price to $307,-500.

As the closing of the sale drew near, the Debtor realized, apparently for the first time, that Weinstein's interpretation of the mortgage and the September 13 Stipulation would require the Debtor to pay a penalty of 2% of the outstanding principal, and not just the unpaid installment, for each and every month the mortgage was in arrears.[12] A 2% per month penalty amounted to an additional $3,200 per month, an amount equal to almost twice the normal monthly payment of $1,466.67 required by the mortgage. This dispute led to the eleventh hour entry into a second stipulation dated December 29, 1984 and so ordered the same date. See footnote 4. Under the second stipulation, the Debtor agreed to pay Weinstein the aggregate amount of $26,000 for late charges, penalties and interest due through December 1, 1983 and Weinstein waived payments for periods thereafter. Although the Debtor and its counsel must accept some of the blame for this debacle over the 2% penalty clause, the court has concluded that the primary blame must fall on Weinstein. The terms of the September 13 stipulation itself are strongly suggestive of the parties' mutual understanding being that placed on the agreement by Nicfur. As the cash proceeds of sale were only $75,000, a $3,200 per month penalty would have rendered the carefully detailed cash sharing provisions essentially meaningless. Surely Weinstein cannot have believed, given his knowledge of the background of disputes and of the Nicfur principals, that they were willing and agreeable to paying him $3,200 per month.

Although it can be argued that the Debtor might have chosen to settle any way had the Debtor been aware of the problem, it cannot be assumed that the Debtor would have settled on the same terms. Moreover, the 2% penalty clause would have been fair grounds for litigation. Another court has held in a well-reasoned opinion on very similar facts that deacceleration has the effect of returning the parties to their status at a point in time prior to the default and acceleration, thus eliminating an intervening penalty. See *In re Forest Hills Associates (Levy v. Forest Hills Associates)*, 40 B.R. 410 (Bankr.S.D.N.Y.1984).

The closing of the sale to 63 Associates scheduled for December 29, 1983 was not completed, apparently because the Debtor was unwilling to make adjustments requested by the buyer relative to certain violations of record had not been removed as required by the contract. The failure to complete the closing was not attributable to Weinstein.

On January 10, 1984, Weinstein filed an application to lift the automatic stay and

---

11. Whether Weinstein's insistence on the receiver remaining was in his best interests in terms of adequate protection and whether Nicfur was wise to accede is another question altogether. The presence of a receiver resulted in the tenants failing or refusing to pay rent. In October 1983, the Debtor successfully brought on an adversary proceeding against a number of tenants to collect the arrears. Although the receiver's collections from operation of the Apartment Buildings were sufficient to pay the expenses of the properties, they were insufficient to make the monthly mortgage payments on the Weinstein Mortgage.

12. It would appear that Weinstein's interpretation was a correct interpretation of the provision if the mortgage was treated as accelerated from the date called until reinstated at the closing of the sale. A 2% penalty results in exaction of 24% per annum on the outstanding principal in addition to interest charges.

> The relevant provision of the mortgage reads "Should all sums due or payable under the mortgage * * * not be promptly paid in full on or before the due date, stated or accelerated as a result of default, the mortgagor * * shall pay and hereby agree[s] to pay to the mortgagee * * *, interest thereunder at the rate of two (2%) percent per month on the unpaid balance for each and every month, or any fraction thereof, computed from said date of maturity to the date of actual repayment * * *." Weinstein Mortgage, Rider ¶ 4.

permit him to foreclose. The application states

"5. The sole reason for the filing of the instant Chapter 11 case was to stay the * * * State Court foreclosure action. * *

"9. Your applicant is continuing to suffer severe and irreparable harm due to the Debtor's failure to pay and inability to affect a sale of the buildings. * * * As May 1, 1984 approaches [when the balloon payment on the first mortgage was due, see footnote 1], applicant's financial position with respect to the building is deteriorating because financing and/or a purchaser is more and more difficult to obtain and locate as the date of the balloon payment approaches. Thus, applicant's position is becoming more precarious with each passing day. The building is not being run efficiently and applicant is concerned that the condition of the building is deteriorating. * *

*  *  *  *  *  *

"11. There is no hope that the instant Debtor can be rehabilitated or its finances organized, since its sole assets are the Buildings. In addition, despite strenuous efforts by Weinstein and the Debtor to effectuate a sale of the property, there is currently no purchaser for the property and a further protracted time period must necessarily elapse before the building could possibly be sold * * *."

By order to show cause a hearing on the application was scheduled for January 23, 1984. The allegations in Weinstein's application were overdrawn. His allegation that a "protracted time period must necessarily elapse" before the Apartment Buildings were sold was promptly disproven. It is not apparent what efforts at effecting a sale Weinstein had made that could be called strenuous. Any operating problems were attributable to Weinstein's receiver. As indicated below, and as known to Weinstein, Nicfur could have closed the sale had it been prepared to take a reduction in the sale price of $45,000. Surely it could not

be said that "no hope" of rehabilitation existed.

By application dated January 23, 1984, Nicfur sought an order vacating the December 29, 1983 order authorizing the sale of the Apartment Buildings to 63 Associates and sought authority to sell the property to Cambridge Resources Ltd. ("Cambridge"). An order to show cause signed January 23 fixed a hearing on this application for January 26, 1984. Nicfur's application alleges that Associates acted in bad faith with respect to the December 29 closing by asking for a $45,000 reduction in the cash portion of the purchase price. The application stated that the Debtor believed that the closing adjustments with the proposed new purchaser, Cambridge, would not exceed $5,000. Nicfur also sought by a separate application to continue the viability of the December 29 stipulation with Weinstein, as Weinstein took the view that the December 29 stipulation had terminated by its own terms when the closing was not completed by January 6, 1984.

63 Associates opposed the Nicfur's application and stated that it was ready to fulfill its contractual obligations. It requested that the court direct that either the Debtor be directed to fulfill its contractual obligations under the terms of the sales agreement or that the court make a suitable allowance so 63 Associates would receive the benefit of transaction for which it had bargained.

The ultimate outcome of Weinstein's stay application and Nicfur's new sale application was a third stipulation among the Debtor, Weinstein and 63 Associates dated February 14, 1984 and so ordered on February 17, 1984. Under the third stipulation it was agreed that the Apartment Buildings would be sold to 63 Associates for $307,500 "as is" without regard to the terms and conditions of the original agreement. 63 Associates, as the purchaser, agreed to deliver a check to Weinstein for $10,000 in addition to the purchase price representing additional penalties and/or interest due to the Debtor's default under the mortgage to the date of closing. The Debtor agreed to

pay Weinstein the sum of $27,466.67 representing all remaining mortgage arrears, including late charges, penalties and interest and Weinstein waived any further late charges or penalties for the period commencing January 1. Weinstein waived his right to a $7,500 pre-payment of principal provided for under the December 29 stipulation.[13] Weinstein agreed to discontinue his foreclosure action and agreed not to commence a foreclosure action against the purchaser based on pre-existing violations for a period of one year. The final result of Weinstein's endeavors during the Chapter 11 case was that his mortgage was reinstated and he received a total of $37,-466.67 for mortgage arrears, late charges, penalties and interest.

With the factual background in place, it is appropriate to return to the governing legal principles. As is apparent, the court rejects the Debtor's view that the initial foreclosure was fatally flawed legally. However, the court also rejects Weinstein's implicit contention that he was entitled to wage an all-out war at the Debtor's expense once Chapter 11 intervened. Congress intended Chapter 11 to give a debtor "breathing room" within which to reorganize. The rehabilitative purposes of Chapter 11 would not be fostered if an over-secured creditor could oppose a debtor's attempts at reorganization without regard to the probability of success on the merits at the debtor's expense. Code § 506(b) expressly limits a secured creditor's attorneys' fees to those the court finds reasonable.

In fixing the fees at $13,675, this court has taken account of the pre-petition fees of $3,675, which this court finds reasonable, and of the services reasonably related to the Chapter 11, which this court finds to be $10,000. The amount awarded is necessarily an approximation as the award is not based on a disallowance of specific services. The court has carefully considered the time spent on the various services. For example, Platzer & Fineberg expended a total of 33.3 hours, with a time charge of $4,880 after the abortive December 29, 1983 closing in bringing on the § 362 motion and handling the third stipulation. As set forth above, these services were not reasonably required to protect the Weinstein Mortgage or its value. Similarly, as to the other services rendered, this court is of the view that the lodestar approach of time charges multiplied by hourly rates does not produce a reasonable fee. See *In re Penn-Dixie*, 18 B.R. 834, 838–9 (Bankr.S.D.N.Y.1982). The court has fixed the award giving due regard to the actual hours expended, the hourly rates sought, the legal issues pursued, the difficulties encountered, the amounts in issue, and the results achieved and has determined that an award of $10,000, which is slightly less than half of the amount requested for services rendered during the Chapter 11 and 100% of the pre-filing services, a total of $13,675, represents a reasonable fee allowable under Bankruptcy Code § 506(b).[14]

The Debtor as a final matter asks that the court direct payment of any fees awarded to Weinstein's attorneys out of the payments as received on the purchase money mortgage rather than out of the meager cash on hand. The court must deny this request as it sees no such latitude in Bankruptcy Code § 506(b). If the funds are there, the secured creditor is entitled to the dollars in preference to other administration creditors, such as debtor's counsel. It is indeed unfortunate that a small default has had a snowball effect. This, however, is not cause sufficient to change the order of priority.

It does not appear whether or not Weinstein has yet paid his attorneys. If he has, the money should be paid to him. If not, it

13. Because the pre-payment of principal would reduce the amount of the mortgage, it was actually more financially advantageous for Weinstein to insist on the $10,000 payment from the purchaser which was applied to past due interest and penalties.

14. Obviously, the court is concerned only with the obligation of the Debtor to Weinstein. Weinstein no doubt remains obligated to his attorneys in accordance with the terms of their retention agreements.

should be paid one-half to each of his attorneys in order to avoid circuity of payment.

Settle appropriate order.