In re Gary DITTMER and Marvis J.
Dittmer, Debtors.

Bankruptcy No. 87–05320.

United States Bankruptcy Court,
D. North Dakota.

Feb. 1, 1988.

Jean Hannig, Fargo, N.D., for debtors.

Jon Brakke, Fargo, N.D., for FLB.

Michael Thomas, Fargo, N.D., for Norwest Bank–Fargo.

Wayne Drewes, Fargo, N.D., trustee.

## ORDER

WILLIAM A. HILL, Bankruptcy Judge.

Before the court is a motion for post-confirmation modification of a Chapter 12 plan. The motion was filed on January 8, 1988, and amended on January 20, 1988. The proposed modification is resisted by the United States Trustee, the standing Chapter 12 trustee and the Federal Land Bank of St. Paul (FLB). A hearing was held on January 20, 1988.

The Debtors filed their Chapter 12 petition on April 2, 1987, and obtained confirmation of their second amended Chapter 12 plan on August 3, 1987, after meeting creditors' objections to their original plan.

1.

The confirmed plan provides for payment of all administrative expenses as of the effective date and payment of accrued real estate taxes in three annual installments commencing with February 15, 1988. It treats the class of Federal Land Bank (Class 1), Norwest Bank (Classes 2, 3 and 4), Dakota Bank and Trust Company (Class 5), and John Deere Company (Class 6) in accordance with pre-confirmation agreements. Norwest's Class 4 claim in the sum of $68,313.00 stems from its interest in the 1986 crop which it was agreed could, in part, be used by the Debtors for 1987 expenses and to the extent used, repaid with interest by December 31, 1987. Dakota's Class 5 claim in the sum of $19,200.00 also stems from consumption of cash collateral and provides for repayment by December 31, 1987. Class 8 is comprised of $9,000.00 in unpaid 1986 farm lease arrearages, the renewal of which are contingent upon immediate payment. Class 1 is the secured claim of FLB in the sum of $300,000.00 which, per agreement, is to be paid in ten annual installments reamortized over twenty-five years at 9½% for the first three years and at a variable rate thereafter. The first payment in the sum of $31,788.00 came due on January 10, 1988. Class 2 is a $97,000.00 claim of Norwest secured by real estate. This obligation is to be paid in fifteen annual installments amortized over

thirty years from June 23, 1987, at 11% from June 23, 1987 for the first five years and thereafter at the bank's then existing agricultural base rate. The first annual payment in the sum of $11,157.91 came due on January 10, 1988. Class 3 is a $130,-626.96 claim of Norwest secured by machinery and life insurance. It is payable in four annual installments amortized over seven years at 10½% after June 23, 1987. The first payment in the sum of $27,274.91 came due on January 10, 1988. Class 6 is a $5,688.00 claim of John Deere. By agreement this amount is payable in four annual installments amortized over seven years at 9¾% interest from June 23, 1987. The first payment of $1,158.78 came due on December 31, 1987.

The plan specifically provides in the case of Classes 1, 2 and 3 that should the Debtors default in any of the payments the automatic stay shall terminate without further order of the court thereby permitting the creditor to enter a judgment of foreclosure consistent with pre-confirmation stipulations.

2.

The foregoing payments were predicated upon projected income and expense figures attached to the second amended plan and which were reviewed at the confirmation hearing. The Debtors in considerable detail projected 1987 cash crop income of $139,648.00 and other cash revenues of $175,227.00 for a total gross income of $314,875.00. Expenses were projected at $232,655.00 leaving a projected net profit for 1987 of $82,220.00.

Unfortunately, actual results for 1987 fell far short of projections for a variety of reasons. Actual cash crop income was $100,837.00 due to weather and insect damage. Other cash revenues came in at $161,-164.00 and actual expenses were $228,-926.00.

The Debtors have repaid Norwest the cash collateral consumed but due to lack of funds they are unable to meet the payments presently due Classes 1, 2, 3 and 5, as well as the trustee, the total of which is $78,515.00. The Debtors presently have on hand $45,085.00 and anticipate receiving another $18,800.00 in 1988 for the balance of their 1987 farm program, deficiency and crop support payments. They also anticipate an advance 1988 deficiency and crop support and equipment rental payment in February 1988 of $22,000.00. However, according to the testimony of a FLB special credit loan officer, the total amount of government payments remaining for 1987 will be only $5,000.00 and in 1988 the Debtors can expect government payments considerably below what they anticipate.

The Debtors have $14,887.00 in unpaid taxes, legal fees and lease payments remaining from 1987 and wish to pay $12,-887.50 towards these. Exactly when or how they will pay the balance of these priority expenses is not revealed.

The Debtors propose to modify the plan by paying Classes 1, 2, 3, 5 and the trustee a portion of the defaulted 1987 payments on February 1, 1988, with the remainder of the default being cured on October 10, 1988. As calculated by the Debtors, they would make the following payments on February 1, 1988:

| | | |
|---|---|---|
| Class 1 | – FLB | $ 9,764.84 |
| Class 2 | – Norwest Bank | 3,254.95 |
| Class 3 | – Norwest Bank | 8,679.86 |
| Class 5 | – John Deere | 1,158.78 |
| Trustee | | 2,539.82 |
| Total | | $25,398.25 |

The balance of the 1987 payments due on January 10, 1988, to the foregoing entities is calculated by the Debtors to be $49,-000.00 and would be paid from 1988 generated income. Additionally, the Debtors wish to change the annual payments to Classes 1, 2 and 3 to semi-annual for all subsequent years commencing with February 10, 1989. The secured claim of FLB would be adjusted from $300,000.00 to $308,500.00 and payments would be increased to $32,688.47 with interest accruing as of February 1, 1987.

The Debtors ability to meet these modified payments is based upon farm income and expense projections for 1988. They believe their 1988 farm income will be sufficient to take care of the January 10, 1988 defaults as well as the $79,508.00 of plan payments coming due in 1989.

They project 1988 cash crop income of $137,190.00 from the same crops planted in 1987 and from which they derived an income of only $100,837.00 in 1987. For 1988 the Debtors have elevated anticipated crop yields considerably. Wheat is now projected at 50 bushels per acre where in 1987 it was at 45 bushels per acre. The county yield for the Debtors' county is only 30 bushels per acre. Barley projects are up from 45 bushels to 70 bushels per acre, corn is up from 80 bushels per acre to 90 bushels per acre, soybeans are up from 30 bushels per acre to 35 bushels per acre and sunflowers are up from 1,500 pounds per acre to 1,800 pounds per acre. The yield on navy beans remains the same. These 1988 yield projections are far beyond what was projected for 1987—projections which were not themselves met and which, according to the Debtors, were regarded at the time of their preparation as conservative. Other revenues are projected at $101,900.00 inclusive of anticipated government program payments of $58,300.00. Total 1988 revenues are projected at $239,090.00. Expenses for 1988 have been considerably reduced to $101,250.00 leaving a projected balance available for plan payments of $137,840.00. The 1988 projected net profit is considerably above the Debtors' historical experience. For the years 1981 through 1986 the average net profit was $78,000.00 as derived from the Debtors' tax returns.

### 3.

A confirmed Chapter 12 plan may be modified anytime after confirmation but before completion of plan payments. 11 U.S.C. § 1229. The plan may be modified to increase or reduce the amount of payments to a particular class, extend or reduce the time for payments or alter payments to a particular creditor in order to recognize payments made outside of the plan.

Post-confirmation modifications pursuant to section 1229 are made to appear disarmingly simple. There is nothing in the statute itself suggesting that the debtor bears a burden of demonstrating a change in circumstances in order to propose a modification. Indeed, reference to the legislative history of Chapter 13, upon which Chapter 12 is based, suggests that post-confirmation modification is intended as a method of addressing unforeseen difficulties that arise during plan administration.

"If a problem arises in the execution of the plan, the bill permits modification of the plan, either through a scaling down of payments, a temporary moratorium, or an extension of time for performance. If the problems, such as a natural disaster, a long term layoff, or family illness or accidents with attendant medical bills, are severe enough that modification is impracticable, the debtor's inability to make further payments is due to circumstances for which he should not justly be held accountable, and if his creditors have already received at least what they would have if the debtor had opted for straight bankruptcy, then the court may terminate performance under the plan and grant the debtor his discharge notwithstanding incomplete performance."

H.Rep. No. 595, 95th Cong., 1st Sess., pt. 1 at 125 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6086. While the right to propose a modification bears no particular burden of proof, insofar as reasons are concerned, the modifications themselves do place upon the proponent a burden of proving the modifications comply with Chapter 12's provisions pertaining to plan content and confirmation as set out in sections 1222(a), (b), 1223(c) and 1225(a), to no less a degree than if originally proposed. The nature of the circumstances giving rise to the need for modification and the degree by which they affect plan execution do not obviate this burden and consequently are really immaterial to the issue of whether modification should be allowed except to the extent they impact upon the Debtors' continuing ability to fund a plan. As the Chapter 13 legislative history suggests, the circumstances leading to a need for modification may be so grave that no modification

can meet the feasibility requirements.[1]

FLB's principle argument against modification is that the payments proposed pursuant to the modification simply cannot be met as the 1988 projections are unrealistically optimistic. When a modification is proposed the court cannot blindly accept the proposal without once again reviewing the plan as it is to be modified to see that it meets the fundamental requirements necessary for confirmation in the first place. FLB's objection speaks to one of these requirements—that the debtor will be able to make all payments under the plan and comply with it. 11 U.S.C. § 1225(a)(6).

■ When a Chapter 12 plan is initially presented for confirmation this court expects it to be the product of a good faith and well thought out assessment of the farm's future income prospects. Inherent in such assessment should be a realistic anticipation of necessary capital, sources of that capital, crop yields and natural disasters. This court has previously held that future cash flows should not be premised upon heightened yields or market data unless there is an objective basis for them. As stated in *In re Konzak*, 78 B.R. 990 (Bankr.D.N.D.1987):

> While this court will give a debtor the benefit of the doubt and will accept testimony bearing on the issue of what might be reasonably expected to happen to crop yields and grain prices in the future, such testimony should be based upon historical production figures, county averages or ASCS proven yields.

78 B.R. at 994 (citing *In re Anderson*, 52 B.R. 159 (Bankr.D.N.D.1985)). This court is careful to objectively review all submitted Chapter 12 plans and where questions of feasibility remain, require the debtor at the confirmation hearing to prove the plan is realistic and will cash flow. It does no one any good to blindly confirm either a plan or later modification that is incapable of cash flowing. To confirm such a plan would shortly result in default and to approve such a modification would result in a merry-go-round of annual modification due to failed projections. Results as these are not within the intent of Congress. Chapter 12 is intended as a means of affording a struggling farmer with a last but best opportunity to save his farm by writing down secured debt to the present value of collateral. A debtor retaining collateral under Chapter 12 can never completely erase an obligation secured by that collateral and must recognize that post-confirmation income has to be sufficient to afford the secured creditor a property distribution with a value at least equal to the allowed amount of its claim. 11 U.S.C. § 1225(a)(5)(B). A debtor cannot escape this requirement as long as he possesses the secured property.

■ In the instant case the Debtors must generate sufficient excess income each year to pay Classes 1, 2, 3 and 5, as well as the trustee, the aggregate sum of $78,515.00 on top of all other operating and living expenses. In 1987, despite what the Debtor, Gary Dittmer, acknowledged were conservative projections, the Debtors' actual cash crop revenues fell short of their 1987 projections by 27.8%. The proposed modification is based upon 1988 cash crop income projections that exceed 1987 actual experience by 36%! To reach the 1988 cash crop income projections the Debtors have factored in crop yields which are on the average 19% higher than what was projected for 1987—a projection that was missed by a 27.8% margin. If actual yields in 1987 are an indication of what the 1988 actual experience will be, then the Debtors 1988 cash crop income projections may be overstated by as much as 50%. If one uses the 1987 yield projections for 1988 the cash crop income becomes $117,918.00, which is still considerably above the actual results for that year. If the Debtors' actual cash crop income in 1988 bears the same ratio to

---

1. The issue of post-confirmation modification as it pertains to Chapter 12 is one of first impression in this district and research has disclosed no published cases dealing with modification in the context of Chapter 12. Reliance has been placed upon those cases addressing post-confir-

mation modification in Chapter 13 cases. *See generally, e.g. In re McCollum*, 76 B.R. 797, 16 B.C.D. 388 (Bankr.D.Or.1987); *In re DeMoss*, 59 B.R. 90 (Bankr.W.D.La.1986); *In re Davis*, 34 B.R. 319 (Bankr.E.D.Va.1983).

1988 projections as it did in 1987, then the 1988 actual cash crop income will be only $99,052.00 even at the heightened yield projections!

From the foregoing analysis the court cannot help but conclude that the Debtors' 1988 cash crop income projections are overly optimistic and are not based upon actual experience. The results of the 1987 crop year cannot be ignored if future projections are to have any reliability since the very same problems visited upon the Debtors' farming operation in 1987 may recur and unless the 1987 results are proved to be a nonrecurring anomaly, the 1988 projections should be hedged by taking them into account. The Debtors' historical net profit for previous years suggest that the 1987 experience was not an anomaly. The facts do not lend credence to the Debtors' cash crop income projections upon which the proposed modification is based, nor do they substantially support their projected farm program revenues. These too appear to be overstated.

The 1988 projections are unreliable and do not convince the court that the plan, as it is to be modified, is capable of cash flowing. The Debtors' probable 1988 income is incapable of generating the necessary net income to service the 1987 carry over payment as well as the 1988 plan payments.

Accordingly, the court finds that the requirements of section 1229 are not met and the modification is DENIED.

SO ORDERED.