**In re Lyle M. HAGEN and Carol K. Hagen, Debtors.**

**Bankruptcy No. 87–06069.**

United States Bankruptcy Court, D. North Dakota.

Jan. 18, 1989.

David Johnson, Fargo, N.D., for debtor.

Wayne Drewes, Fargo, N.D., Trustee.

Richard Olson, Minot, N.D., for Farm Credit.

## ORDER

WILLIAM A. HILL, Bankruptcy Judge.

By motion filed December 16, 1988, the Debtors seek to modify their confirmed Chapter 12 plan in order to overcome significant cash shortfalls that occurred in the first year of the plan and which resulted in a material default. The modification is opposed by Farm Credit Bank of St. Paul, successor to Federal Land Bank, as well as the standing Chapter 12 trustee. A hearing was held on January 5, 1989.

**1.**

The Debtors' amended Chapter 12 plan was confirmed by Order entered April 22, 1988. As confirmed, the five-year plan incorporates a stipulation between the Debtors and Federal Land Bank of St. Paul (FLB) providing that FLB would have a secured claim in the sum of $235,000.00 and an unsecured claim of $82,902.00. Payment of the secured claim over the five years requires $23,400.00 on January 10th of each plan year commencing on January 10, 1989, with the remaining balance after five years amortized over twenty-five years according to stipulated terms. A deed to the real property mortgaged as security was placed in escrow with FLB's attorney with the requirement being that failure to make the prescribed payment would result in its delivery to FLB for recording. The plan further provides that default in the aforementioned payments would trigger immediate relief from stay in favor of FLB.

In addition to the obligation owing FLB, the plan provides for: payment of $10,-873.00 of unpaid real estate taxes over five years at $3,000.00 per year, the first payment due January 10, 1989; payment of FDIC's $37,073.00 secured claim amortized over ten years and payable in seven annual payments of $6,033.00, the first payment coming due January 10, 1989. The foregoing payments, aggregating $32,433.00, were based upon projected 1988 net farm income of $37,108.00.

**2.**

The Debtors reside in Maddock, North Dakota, where in 1988 they farmed 442 tillable acres and had another 143 tillable acres in government set aside. At the time of confirmation they projected crop income, consistent with historical yields, of $44,-087.00 from 442 acres planted into wheat, barley and flax plus $32,661.00 from government program payments and $2,500.00 from Lyle's off-farm employment at a farm equipment company. Total projected income from these sources was $79,248.50. Total 1988 operating expenses were projected at $27,140.00 and family living expenses were projected at $15,-

000.00 for total projected expenses of $42,-140.00.

Unfortunately, the Debtors actual results this past year are considerably different from these projections due to circumstances which the Debtors argue were beyond their control.

Actual 1988 income was $60,038.00. This $19,210.00 shortfall stems exclusively from greatly reduced crop income occasioned by the 1988 drought. Although crop income was only $18,040.00, otherwise the Debtors' income from government payments and off-farm income exceeded the sums anticipated from those sources. Actual government payments and crop insurance were $37,826.00 against $32,661.00 projected and off-farm income was $4,175.00 against $2,500.00 projected. The heightened off-farm income was due to Carol's recently obtained employment at a noodle plant—employment which she intends to continue through 1989.

1988 actual expenses of $68,205.00 ($59,-826.00 paid plus $8,379.00 accrued but unpaid) far exceeded the $42,140.00 projection and resulted in a net income of only $200.00 which is far below the $35,676.00 necessary to meet the plan payments and the trustee's fee due January 10, 1989.

Operating expenses, inclusive of everything but living expenses of $14,000.00, totalled $45,826.00 and reveal a number of expense items that greatly exceeded projections despite the poor crop year. Actual fuel expenses were $5,438.00 as opposed to $2,500.00 projected. Repairs and supplies ran $6,636.00 as opposed to $2,500.00 projected. Miscellaneous expenses exceeded projections by $1,596.00. Although living expenses were originally projected at $15,000.00, Lyle testified that expenses normally regarded as family living were actually $24,000.00 in 1988 and he believes they will be $2,000.00 per month on into the future. The following 1988 incurred expenses were not even projected: interest expense $1,585.00; medical expenses $2,038.00; medical insurance $1,862.00; CCC payback $9,281.00; operating loan $1,900.00. The Debtors anticipate additional 1988 income of $8,622.00 coming in but they have unpaid 1988 expenses remaining of $8,379.00 inclusive of an unpaid operating loan of $1,900.00. Save for possible payment of the real estate tax installment of $3,000.00 to be made from 1988 income still due, the Debtors have no ability to make the 1988 plan payments to FDIC or FLB and have materially defaulted under the terms of the confirmed plan. Moreover, in calculating their 1988 expenses they omitted $11,519.00 due the IRS for 1987 income taxes.

In order to salvage their Chapter 12 reorganization and forestall the deed back to FLB, the Debtors propose modification of the plan by surrendering eighty crop acres worth $310.00 per acre to FLB in lieu of the $23,400.00 payment due on January 10, 1989, with the right to lease it back for 1989 if FLB has not sold it by March 1, 1989.[1] In lieu of the $6,033.00 cash payment to FDIC the Debtors propose returning a combine. The recently discovered IRS claim would be paid in five annual installments of $3,038.00 commencing December 31, 1989.

With the elimination of FDIC as a creditor, the Debtors will need to generate $32,-380.00 ($29,438.00 plus the Trustee's ten percent)[2] each succeeding plan year in order to service FLB, Benson County tax authorities and the IRS.

According to the Debtors this will be achieved in 1989 and future years by farming 531 acres planted into wheat, barley and flax which, given a normal year and current prices, is projected to yield $57,-860.00. Income from government payments is projected at $5,998.00 for a total farm generated income of $63,857.00. The

---

1. It is unclear from the proposal what the effect of the deed back is on FLB's secured claim and the five years of annual payments. Whether the deed back is intended to reduce the secured claim to $210,200.00 and the resultant amount to be amortized is not specified. The Court will therefore assume the effect is merely to reduce the remaining balance due on January 1, 1993.

2. This figure assumes payments to FLB in the years 1990 through 1993 remain fixed at $23,-400.00.

Debtors acknowledged at the hearing that in calculating the 1989 crop projections they neglected to take into account the proposed eighty-acre deed back.

Substantial off-farm income is projected for 1989 and succeeding years which the Debtors say will be used exclusively for the $24,000.00 of anticipated living expenses. The off-farm income is to come from Carol's job which nets $550.00 per month or $6,600.00 per year. Lyle has just begun employment as a commissioned salesman of tow trucks from which he hopes to generate $18,000.00 a year from his share of commissions on sales of eighteen trucks per year. He has no prior experience selling trucks and no evidence was offered on the market success experienced by this product.

1989 operating expenses are projected at $23,100.00 which if accepted as accurate would result in net farm income of $40,757.00. Omitted from the Debtors' projections however are numerous items of expenses incurred in 1988 which would likely be reoccurring in future years:

| | |
|---|---|
| utilities | $ 3,740.00 |
| property and life insurance | $ 3,500.00 |
| vehicle licenses | $ 426.00 |
| labor | $ 420.00 |
| fuel/heating | $ 453.00 |
| medical insurance | $ 1,862.00 |
| medical expense | $ 2,038.00 |
| real estate taxes | $ 2,450.00 |
| miscellaneous | $ 2,596.00 |
| operating loan | $ 1,900.00 |
| Total | $19,385.00 |

Also omitted in the 1989 projected budget is any amount for 1988 income taxes, a probable 1989 operating loan and possible lease back of the eighty acres proposed to be returned to FLB. Lyle testified that he has a 1989 operating loan lined up at Benson County Credit Union. From the Debtors' lack of available cash it must be assumed this loan will be at least the equal of what it was for 1988. Assuming the lease back from FLB a reality and using an assumed per acre rental of $30.00 would mean an additional budget item of $2,400.00. Based on past experience it is likely the Debtors' total operating and living expenses for 1989 will be $58,885.00

(projected operating expenses of $23,100.00 plus 1988 actual living expenses of $14,000.00 plus omitted items of $19,385.00). The total 1989 projected income from all sources would be $88,457.00. This leaves a net disposable income of available for debt service of $29,572.00.

3.

Section 1229 of the Code contemplates that a confirmed Chapter 12 plan may be modified any time but that any modification must meet the requirements of Sections 1222(a), 1222(b), 1222(c) and most importantly in situations where the modification was preceded by a material default, Section 1225(a).

Under 1225(a)(6) the Court must be satisfied that any proposed modification, as with the original plan itself, is capable of cash flowing. This Court does not believe any particular showing of special or unusual circumstances is necessary in order for a debtor to request modification. *In Re Dittmer*, 82 B.R. 1019, 1021 (Bankr.N.D. 1988). The fact that payments cannot be met under the existing terms is circumstance enough. However, the nature of the circumstances giving rise to the need for modification has a definite bearing upon the reliability of the debtor's financial data upon which the plan is based and the prospect for his continuing ability to make the payments and otherwise comply with plan terms. In proposing a modification the defaulting debtor must be able to show that the default was the product of circumstances not likely to reoccur and thus amenable to being remedied by the modifications proposed. It is in this posture that the circumstances ought to be considered.

The drought of 1988 was an extremely unfortunate event for agriculture and is an event which must be regarded as unanticipated and nonreoccurring if farm projections are to have any meaning at all. Thus the resulting poor yields can be regarded as a one-time anomaly not reflective of a normal crop season and one which need not be factored into future projections. The same cannot be said for actual expenses that widely missed the projection

712

mark. It is difficult to see how an experienced farmer projecting a 16,000 bushel harvest as the Debtors did for 1988, can project fuel expenses at $2,500.00 and repairs at $2,500.00 yet wind up with actual fuel expenses of $5,400.00 and actual repairs of $6,600.00 all in a drought year. It is even more quizzical to understand how a married farm couple with a long history of farming experience can over shoot projected living expenses by 60%. The fact that actual 1988 expenses exceeded projections by 38% does not bode well for the credibility of their new 1989 projections. Although this Court has many times stated that it will afford a debtor the benefit of the doubt regarding plan feasibility, once there has been a post-confirmation default occasioned by budget overruns, that doubt must be resolved against the debtor. This Court will not confirm either a plan or approve subsequent modifications that are incapable of cash flowing. At the initial confirmation stage the Court will often overlook income projections that are overly optimistic as well as expense projections that are tight. However, once post-confirmation experience confirms the Court's doubts, a debtor will not be allowed much margin for error. Efforts to satisfy the feasibility requirement in context of a post-confirmation modification must be accompanied by accurate financial data sufficient to overcome the prejudicial effect of the preceding year's budget experience. Optimistic promises and budgets are not enough, since words, after an event have little probative value.

In the case at bar, the Debtors premise the feasibility of their plan modification upon 1989 budget projections which are not only optimumly optimistic regarding likely income, but also wildly inaccurate as to expenses likely to be incurred. The Court can accept the projected crop income as accurate but cannot accept the Debtors' belief that they will be able to produce $18,000.00 from the sale of tow trucks. This is a new untried endeavor for Lyle and at the present success is merely speculation. Expense figures fail to take into account many items which by past experience ought to be included. In sum, the

Court is not convinced that the 1989 budget is an accurate reflection of probable 1989 results. Moreover, even if it were, it still falls short of producing the necessary income to cash flow plan payments. Assuming the accuracy of the 1989 budget income and plugging in the likely expense figures leaves only $29,572.00 in net income. The Debtors need $32,380.00 in 1989 to fund the plan at present levels.

Accordingly, the Court finds that the Debtors have failed to satisfy the requirements of Section 1229(b) and the Motion for Modification of their confirmed Chapter 12 plan is DENIED. The plan as confirmed remains binding in all its terms upon the Debtors and their creditors.

SO ORDERED.