**In re LARSON, Delbert George and Larson, Bernice H., husband and wife, Debtors.**

**Bankruptcy No. 87–02466.**

United States Bankruptcy Court, D. Idaho.

Jan. 2, 1991.

Roger L. Williams, Orofino, Idaho, for debtors.

stances under § 523(a)(3), in essence adopting the *Robinson v. Mann* approach. This court does not read *Lochrie* so expansively.

David R. Risley, Lewiston, Idaho, for Farm Credit Bank of Spokane.

Ford Elsaesser, Sandpoint, Idaho, Chapter 12 Trustee.

W. Jeff Davis, Boise, Idaho, for Deutz–Allis Credit Corp.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

After a hearing, the Court took under advisement Debtors' motion to modify the terms of their confirmed Chapter 12 plan, and the objections thereto of the secured creditors Farm Credit Bank of Spokane ("FCB") and Deutz–Allis Credit Corporation ("DACC"). The record consists of certain uncontested representations of counsel for the parties made at the hearing, together with several documentary exhibits admitted by stipulation providing historical information as to Debtors' income and expenses.

## THE PLAN

Debtors filed for relief under Chapter 12 on August 11, 1987. After negotiating claim treatment provisions with their major creditors, including FCB and DACC,[1] the Court confirmed their Chapter 12 plan, as amended by the stipulations with FCB and DACC, on March 11, 1988. The plan called for annual payments to creditors commencing in December of 1988. By deferring normal debt service requirements through the plan, Debtors had access to their current farm income with which to operate.

The plan was confirmed on the basis of a budget that called for about $147,000 in income, of which $136,500 was to be farm income, and from which total operating and living expenses of about $80,000 were to be paid. Annual plan payments to service secured debt and administrative expenses amounted to about $61,000. From the exhibits admitted at the motion hearing, this budget is somewhat optimistic in its projections of expenses, since in the four years (1984–1987) preceding the filing Debtors' expenses ranged from a high of $137,000 to a low of $80,000, with a four year average of $104,000. As indicated above, however, the plan was confirmed without contest from the creditors or trustee, and therefore the Court was not called upon to do a comprehensive feasibility analysis of the operation.

Debtors were able to make the plan payments in December of 1988. However, their income in 1989 was only $122,600, while their expenses were $121,000, leaving no margin for plan payments. At that point, with Court approval and no objection from the creditors or trustee, Debtors secured an operating loan from a local bank, which loan included amounts sufficient to make the December 1989 payments. As a result of their 1990 operation, Debtors were able to generate only about $13,000 in net income ($123,000 income—$110,000 in expenses) and are now unable to make the December, 1990 payments due under the plan.

Debtors have filed a motion under Section 1229 of the Code seeking permission to simply skip their payments due in December of 1990. They wish to add those payments on to an extra year at the conclusion of their plan. FCB and DACC object to the proposed modification. In addition, the Chapter 12 Trustee is unwilling to support Debtors' proposal.

## STANDARDS APPLICABLE TO POST-CONFIRMATION MODIFICATION OF CHAPTER 12 PLANS

A Chapter 12 plan may be modified after confirmation to increase or reduce the amount of payments to a class of creditors; to extend or reduce the time for payments; or to alter payments to a particular creditor in order to account for payments made to that creditor outside the plan. 11 U.S.C.

---

1. FCB held a fully secured claim secured by a mortgage on Debtors' real estate. FCB's claim was to be paid in full with one delinquent payment to be reamortized and another to be paid after confirmation. DACC held a claim secured by farm equipment. A "cram down" of the DACC claim was negotiated whereby the secured portion would be paid in annual payments with interest, and the unsecured portion would be lumped together with other unsecured claims and paid from Debtors' disposable income, if any.

§ 1229(a). Therefore, Debtors' proposal fits within the types of post-confirmation plan modifications authorized by the Bankruptcy Code. In addition, Section 1229(b) dictates that a modified plan must meet the same content requirements of Section 1222(a) and (b) and be judged by the same Section 1225(a) confirmation standards as an original plan.

■ The Code is silent, however, as to the extent of the factual showing that should be required by the Court from the proponent of a modification. That is, assuming the modified plan meets the statutory requirements for approval, should the Court demand that the proponent justify the underlying need for the modification? The objecting creditors insist that a modification can only be allowed if it is based upon an unforeseen change in the debtor's business or financial circumstances.

The authorities and case law vary in their approaches to this issue. For example, one court has held that since a modified plan must meet the usual confirmation standards, "[t]he nature of the circumstances giving rise to the need for modification and the degree by which they affect plan execution ... are really immaterial to the issue of whether modification should be allowed except to the extent they impact upon the Debtors' continuing ability to fund a plan." *In re Dittmer*, 82 B.R. 1019, 1021 (Bankr.D.N.D.1988); *see also In re Hagen*, 95 B.R. 708 (Bankr.D.N.D.1989) (The fact that plan payments cannot be met is circumstance enough to justify modification). As explained by one authority:

> It is probably sufficient to show that the debtor's net income from the debtor's farming operation was greater or lesser than that projected by the debtor at confirmation. If the debtor's net income was less than projected, and the debtor is not able to meet the debtor's payment obligations under the plan, the debtor may seek a modification to reduce the amount of the debtor's payments under the plan.

5 L. King, Collier on Bankruptcy, ¶ 1229.01, 1229–3 (15th ed.1990). According to the authors, this approach is based upon a recognition of the practical difficulties in projecting farm income, and therefore, modifications should be regarded as "routine and expected." *Id.* Put another way, because of the nature of farming, the Court and the parties must "expect the unexpected" and allow farm debtors to modify freely in order to accord them effective relief under Chapter 12.

Other Courts and the objecting creditors here have taken a view that requires a debtor to demonstrate that the need to modify the plan is the result of substantial and unforeseen changes in debtor's business circumstances. *See In re Sword*, 90 I.B.C.R. 459, 461 (Hagan, J) (modification proposed to compel secured creditor to provide operating capital);[2] *Matter of Grogg Farms, Inc.*, 91 B.R. 482 (Bankr.N.D.Ind. 1988) (debtor attempts modification to avoid default provisions of plan); *In re Cooper*, 94 B.R. 550 (Bankr.S.D.Ill.1989) (attempted reduction in payments attributable to post-confirmation decline in value of equipment); *In re Pearson*, 96 B.R. 990 (Bankr.D.S.D.1989) (trustee seeks modification to increase payments attributable to newly discovered asset). The cases cited, however, are somewhat distinguishable. In one sense, these cases may more properly be characterized as critical of the type of modification proposed, as opposed to the underlying reasons for the modification. For example, regardless of the good faith basis for a debtor's inability to make payments under a confirmed plan, the debtor will likely be bound to the amounts set for allowed secured claims at the time of confirmation. *In re Cooper*, 94 B.R. at 552. At the very least, the decisions demanding an unanticipated change in debtor's circumstances appear "fact-specific."

---

**2.** In *Sword*, the Court notes "[f]urther, as a minimum requirement under Section 1229(a), a change of circumstances ought to exist which would warrant the modification." 90 I.B.C.R. at 461. The Court does not discuss the reasons for such a requirement, nor is there an indication whether the change in circumstances need be unforeseeable, likely because the Court finds that such a change in circumstances is present in the form of a water shortage. Id. The proposed modification is rejected, however, on other grounds.

Section 1229 of the Code is patterned after Section 1329 governing post-confirmation modification of Chapter 13 plans. The *Dittmer* decision discussed above resorts to the legislative history of Section 1327 in analyzing whether a modification under Section 1229, as a threshold, requires an unforeseen change in the debtor's circumstances. 82 B.R. at 1021, *citing* H.Rep.No. 595, 95th Cong., 1st Sess., pt. 1 at 125 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6086. With respect to Section 1329, a similar debate rages in the case law as to the presence of any "change of circumstances" prerequisite to modification. One recent decision catalogues the divergent authorities on this issue and concludes, because of the nature of Chapter 13, no such "change in circumstances" needs to be shown, unforeseen or otherwise. *In re Perkins,* 111 B.R. 671, 673 (Bankr.M.D.Tenn.1990).

Chapter 12, unlike Chapter 13, however, was designed to apply strictly to family farm businesses. Because all cases under Chapter 12 involve business reorganizations, and considering the unique nature of farming as a business, the Court should exercise considerable caution in the wholesale adoption of Chapter 13 authorities as a basis for interpreting Chapter 12 provisions.[3] Interestingly, the chapter of the Code designed to accommodate business, as opposed to individual, reorganizations requires the Court to find that the "circumstances warrant" a post-confirmation modification. 11 U.S.C. § 1127(b).

After consideration of the different approaches advanced by the authorities, this Court is unprepared to announce any absolute conditions or restrictions on the right to propose modifications to a confirmed Chapter 12 plan outside of those expressed in the statutes. Section 1229(a) contains no language which should be construed to require, as a matter of law, that the modification proponent prove a change in a debtor's financial or other circumstances as a basis for the desire to modify a plan. Had Congress intended that the Courts scrutinize

the circumstances surrounding a case to decide if they "warrant" the modification, it could have employed specific language incorporating such condition as they did in Section 1127(b). Rather, Congress has imposed certain limits on the kinds of modifications that may be proposed in Section 1229(a)(1)–(3), and has instructed the Courts to evaluate proposed changes to a plan under the same standards as original plans under Section 1222(a) and (b), and most importantly Section 1225(a). 11 U.S.C. § 1229(b).

These statutory guidelines are sufficiently flexible so as to allow the Court considerable discretion in passing on the propriety of proposed changes to a plan. There is ample basis in the applicable provisions of the Code to allow the Court to ferret out arbitrary or inappropriate modifications. In particular, compliance with notions of finality and res judicata under Section 1227(a) of the Code, good faith under Section 1225(a)(3), and feasibility under Section 1225(a)(6), pose adequate burdens to the modification proponent to discourage any insincere attempts. However, because of the presence of these statutory standards, there is simply no need to attempt to articulate other supplemental equitable prerequisites to modification.

## DISPOSITION OF THE ISSUES

■ Even applying the somewhat liberal approach announced above, the Court must deny Debtors' motion to modify for a variety of reasons.

Debtors' proposed modification does not address the basic lack of feasibility associated with the operation of this plan. Upon review of the documentary evidence admitted at the hearing, while a decline in income during the plan as compared to the budget projections and historical averages partially contributed to Debtors' predicament, more obvious is the inability of Debtors to operate at expense levels anywhere close to the plan budget. The bud-

---

**3.** *Cf. In re Wood,* 90 I.B.C.R. 436 (Pappas, J.) ("because of the unique nature of farming, the disposable income requirement found in Section 1225(b) presents issues in Chapter 12 that arise only infrequently under Section 1325(b) in Chapter 13 cases").

get proposed annual operating and living expenses of about $80,000, whereas actual expenses for 1989 and 1990 far exceeded this sum. Historical average annual operating expenses suggest that Debtors' budget was flawed from the beginning, and Debtors have not made an adequate showing of how this problem is to be addressed in the modified plan. In fact, based upon the exhibits, even by carrying over about $27,000 from 1990 income for use during 1991, Debtors figures show they will be unable to make plan payments exceeding $60,000 one year from now.

With respect to the burden of proof as to the feasibility of a modified plan, the Court concurs with Judge Hill when he observes:

> Although this Court has many times stated that it will afford a debtor the benefit of the doubt regarding plan feasibility, once there has been a post-confirmation default occasioned by budget overruns, that doubt must be resolved against the debtor.... At the initial confirmation stage the Court will often overlook income projections that are overly optimistic as well as expense projections that are tight. However, once post-confirmation experience confirms the Court's doubts, a debtor will not be allowed much margin for error. Efforts to satisfy the feasibility requirement in [the] context of a post-confirmation modification must be accompanied by accurate financial data sufficient to overcome the prejudicial effect of the preceding year's budget experience. Optimistic promises and budgets are not enough...."

*In re Hagen,* 95 B.R. at 712. Debtors cannot show they will be able to make the payments due under the modified plan. 11 U.S.C. § 1225(a)(6).

■ Likewise, Debtors have offered the Court no evidence to suggest how the proposed interruption of payments under the confirmed plan to secured creditors FCB and DACC protects those creditors' right to the present value of their allowed secured claims. That is, assuming the payment terms of the original plan satisfied Section 1225(a)(5)(B)(ii), the Court cannot conclude without more that by deleting one annual payment to secured creditors the "present value" of the payment stream remains intact. Rather, a change in the time over which payments are made to a creditor would generally also require a change in the interest rate payable to that creditor to preserve the present value of the payments.[4]

## CONCLUSION

Debtors' motion to modify their plan will be denied by separate order. Because of the Court's ruling, there is no need to address the other arguments made by the creditors in opposition to the proposed modification.[5] This memorandum shall constitute the Court's findings of fact and conclusions of law. B.R. 7052.

---

**4.** Whether the terms of a debtor's plan for treatment of secured claims complies with the "present value" requirements of Section 1225(a)(5)(B)(ii) of the Code is a question of fact as to which debtor bears the burden of proof. *In re Fowler,* 903 F.2d 694, 696 (9th Cir.1990); *In re Patterson,* 86 B.R. 226, 227 (B.A.P.1988).

**5.** The Court understands DACC's argument that Debtors are by their modification attempting to avoid the effect of a negotiated "drop dead" clause inserted in the plan in creditor's favor, and authorizing repossession and foreclosure of its lien upon a plan default. While it is obvious that such clauses must have some impact on a debtor's right to modify, the Court will await a more appropriate case to explore the tensions created by the presence of such clauses in a confirmed plan and the debtor's right to modify that plan. *See Matter of Grogg Farms,* 91 B.R. at 484–485 (court will not permit plan to be modified to avoid consequences of a "drop dead" clause over objection of affected creditor); *cf. In re Mader,* 108 B.R. 643, 647–648 (N.D.Ill. 1989) (mere inclusion of a "drop dead" clause in a plan does not, ipso facto, preclude the possibility of later modification).