**UNSECURED CREDITORS'
COMMITTEE,
Appellant,**

v.

**JONES TRUCK LINES, INC.
and Corestates Bank,
N.A., Appellees.**

**In re JONES TRUCK LINES,
INC., Debtor.**

**Civ. No. 91–5143.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Aug. 11, 1992.

Audrey R. Evans, Lax, Vaughan, Pender & Evans, Little Rock, AR, Steven N. Cousins, David L. Going, Armstrong Law Firm, St. Louis, MO, for Unsecured Creditors Committee.

Charles T. Coleman, Isaac A. Scott, Jr., Kimberly W. Tucker, Wright, Lindsey & Jennings, Little Rock, AR, for Jones Truck Lines, Inc., Debtor/Appellee.

Allen W. Bird, II, Thomas P. Thrash, John Thomas Hardin, Rose Law Firm, Little Rock, AR, for Corestates Bank, N.A., Appellee.

JoAnn L. Goldman, U.S. Trustee's Office, Little Rock, AR, for Charles Tucker, Trustee.

MORRIS SHEPPARD ARNOLD, Circuit Judge, Sitting by Designation.

### MEMORANDUM OPINION

There is really no dispute about the facts in this case, only their significance. The dispute between the parties is over the terms of the order of the bankruptcy court[1] dated August 27, 1991, Order Authorizing Use of Cash Collateral and Granting Liens ("Final Order"). Simply put, Jones Truck Line ("the company") declared bankruptcy for the purpose of liquidation rather than reorganization; but it still needed cash just to liquidate. The company owed Corestates Bank ("the bank") about $54 million before the bankruptcy petition ("pre-petition"), and had given security in the form of mortgages, security interests, and liens in substantially all the company's assets. The company still possessed cash in which the bank had a secured interest. The bank agreed to let the company use the cash ("cash collateral") as long as the bank received "adequate protection" under the bankruptcy code. *See* Sections 361, 363(e), 364(c) & (d).[2] The adequate protection given by the bankruptcy court consisted of superpriority (in other words, first priority) liens on all assets of the company, and a superpriority "administrative claim" under the bankruptcy code. The bank and the company are satisfied with the Final Order, but the Unsecured Creditors Committee ("the Committee") is not, and has taken this appeal.

## I.

The first issue is whether the bankruptcy court was required to make a determination of the value of the company before granting "adequate protection."[3] The statute provides that the bankruptcy court condition the use of secured property, such as cash collateral, "as is necessary to provide adequate protection" to the secured party. Section 363(e). The doctrine of adequate protection is designed to ensure that the secured creditor receives the value for which he bargained. *In re Martin*, 761 F.2d 472, 474 (8th Cir.1985). Value is intended to be a flexible concept which should be determined on a case-by-case basis. Similarly, adequate protection must be determined liberally, permitting debtors maximum flexibility in structuring a proposal for adequate protection. *Id.* The Committee argues that the bankruptcy court committed an error of law by not making a determination as to value. It avers that "a secured creditor may be entitled to adequate protection only if and to the extent that the *value* of its collateral declines during the pendency of the bankruptcy case." Committee Br. at 15 (emphasis supplied by the Committee). In the

---

1. The Honorable James G. Mixon, United States Bankruptcy Judge for the Eastern and Western Districts of Arkansas.

2. All statutory citations will be to Title 11, United States Code (bankruptcy code).

3. Whether a secured creditor is adequately protected or not is a question of fact, but whether the proper standard has been applied is, of course, a matter of law. *In re Martin*, 761 F.2d 472, 474 (8th Cir.1985).

absence of a specific finding of value of the bank's pre-petition collateral (*i.e.*, the company's assets), the Committee maintains, the bankruptcy court could not confer adequate protection. The Committee wants this court to remand to the bankruptcy court for a finding of pre-petition collateral.

The bank and the company point out that the Committee's cases are correctly cited but are factually distinguishable. One distinguishing feature is the alignment of the parties. Usually, (1) the company objects because the court refuses to allow use of cash collateral or the company will not give adequate protection sufficient to satisfy the court; or (2) the bank objects because the court allows the company use of cash collateral without protection adequate to satisfy the bank. A determination of value is designed to protect the rights of the bank and determine whether it is undersecured, oversecured, and, well, adequately protected. Although the bank and the company have clear interests, it is hard to see what the unsecured creditor's interest is in the use of the bank's cash collateral. None of the cases the Committee cites, the bank insists, involves an appeal by the unsecured creditors.

The bank argues, moreover, that an analysis of the bank's interest is unnecessary. The company is going to use, not merely cash collateral, but cash. The bank needs assurance that the cash will be returned; otherwise, the bank has no incentive to participate in the bankruptcy. In this case, the cash will simply be used for liquidating the company: no cash will be generated from operations, as is usually the case in a going concern. There is virtually no prospect that new cash will be created from any pre-petition asset upon which the bank did not already have a pre-petition lien. It is uncertain that the bank will get its cash back, because while the bank has $54 million in pre-petition secured debt, the current value of the bank's collateral is somewhere between $44.2 million and $69.7 million. (T. 80.)[4] It is also uncertain whether the bank is oversecured or undersecured, and whether it is adequately protected in

the event that it is undersecured. When the court found that the company's pre-petition debt was $54 million, it necessarily found that the bank's pre-petition interest was $54 million. It is unclear whether the bank will ever recover its money.

The bank argues that in the face of uncertainty as to the ultimate value, a specific determination of value was and is pointless. "The courts have virtually uniformly recognized that the value of the property securing a claim, and thus the allowed amount of the secured claim, may change during the course of the bankruptcy case. Additionally, the need to look to the purpose of the valuation appears to have achieved virtually universal acceptance." 3 Lawrence P. King et al., Collier on Bankruptcy ¶ 506.-04[2] at 506–25 (15th ed. 1992).

More importantly, it is hard to see what would be gained in this case from a remand for a finding by the bankruptcy court as to value. Either the bank gets its $54 million (and any surplus goes to the unsecured creditors) or it does not get its $54 million (and the unsecured creditors would have received nothing anyway). The bank simply wants assurance, in the case of shortfall, that it will get its money back after the company is liquidated. The bank concedes that the bankruptcy court should have determined the value of the cash collateral, but to do so would have been to state the obvious, because it was $2.9 million in cash.

The Committee emphasizes a test set forth in *In re Martin, supra,* and argues that this decision requires, in all cases, a finding of value, before the bankruptcy court may confer adequate protection on a secured creditor. The court stated:

> In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that

**4.** All citations to the transcript refer to the August 1, 1991 proceedings.

value consistent with the concept of indubitable equivalence.

*Id.* at 477. Standing alone, this passage would seem to support the Committee's argument. But it does not. The rationale of adequate protection, the court explained, is that a flexible solution to a debtor's need for cash "must not operate to the detriment of the secured creditor's interest." *Id.* at 476. *Martin* involved an appeal by the bank, which argued that the bankruptcy court's order did not give it adequate protection. Determining value was a first step to evaluating and protecting the bank's interest in its collateral in the context of the bankruptcy court's order. Such protections are necessary because the bankruptcy court's use of the bank's money for the debtor's benefit has constitutional due process implications as a taking (which even the Committee admits, *see* Committee Reply Br. at 11 n. 13). Here, the bank is not complaining about the *court's use of its money, so why should the* Committee complain? In essence, the Committee is attempting to assert the bank's right to a determination of value simply as an attack on the bankruptcy court's order.

## II.

█ The Committee argues that giving adequate protection to the bank was not supported by the evidence because of the existence of an equity cushion. An equity cushion exists when the bank will ultimately receive more than its pre-petition interest. The Committee claims that such a cushion exists because it adduced expert testimony that the value of the debtor's assets might be as high as $69.7 million, while the bank's debt is only $54 million. Hence, the argument runs, there exists an equity cushion of $15 million. But the same expert stated that the value of the assets might be as low as $44.2 million. By the same logic, the bank may be undersecured by $12.4 million.

The Committee reasons that the bankruptcy court ruled that the bank was undersecured, because it granted the bank adequate protection; at the same time, the bankruptcy court allowed the bank postpetition interest, which, it asserts, is only allowable if the bank is oversecured. The Committee avers that the bankruptcy court took inconsistent positions and that its ruling is therefore clearly erroneous. The bank argues (correctly, the court thinks) that the court need not make a finding based on the evidence that the bank is entitled to adequate protection. By virtue of Section 363(e),[5] the company's use of the bank's cash collateral automatically entitles the bank to adequate protection. The bankruptcy court was therefore not clearly erroneous in granting adequate protection.

## III.

The Committee avers that the bankruptcy court's order improperly granted an administrative expense claim under Section 503, and that the bank received a priority claim pursuant to Section 364(c)(1). But these issues were not raised before the bankruptcy court. The Committee did object below to giving the bank a superpriority claim of administration under 11 U.S.C. § 364(c), but in open court the Committee counsel stated that "We got rid of the 364 super lien [objection]" (T. 44), and that he was pursuing above all an objection to the carve-out instead (T. 46–47). That is to say, the Committee was no longer contesting this point. *See* Company's Br. at 14. In its Reply Brief, the Committee did not contest the waiver of objection argument, or even the substance of this point.

## IV.

█ A question concerning the propriety of post-petition interest raises the most difficult issue in the case. The Final Order gives the bank additional "adequate protection" on the $2.9 million cash collateral in

---

5. Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

Section 363(e).

the form of post-petition interest payments by the company.

> (D) *Interest.* Cash collateral advances used by the Debtor post-petition under this Order shall earn interest . . .

Final Order at 8. The Committee argues that under Section 506(b), the bank is not entitled to interest:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section [which allows reasonable expenses for disposing of the property], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Section 506(b). Based on this section, the bank is entitled to interest only if it is oversecured. An oversecured creditor is entitled to interest on the equity cushion (where the value of the secured assets is greater than the debt), but an undersecured creditor is not entitled to post-petition interest payments. *United Sav. Ass'n v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (*"Timbers"*).

The Committee makes two arguments. First, the Committee maintains (in this part of its argument, at any rate) that the bank is undersecured and should be forced to disgorge any interest payments made to it. This argument ignores evidence that the bank may in fact be oversecured. Second, it argues that the cash collateral represents, in essence, an old pre-petition loan, not a post-petition advance, and the bank therefore is earning post-petition interest on a pre-petition debt. *Timbers* could be read to forbid this arrangement.

The bank responds that it is not earning post-petition interest on pre-petition debt as *Timbers* forbids, but that it is receiving post-petition interest on the company's post-petition advance of the cash collateral. The bank argues that the new cash collateral is supposed to be adequately protected under Section 363(e),[6] and thus fully secured; hence, it should earn interest. The

reason that the bank considers the post-petition cash collateral as a new loan or cash advance, and wants interest on it, is because the money being used would otherwise be paid to the bank. (Bank's Response to the Committee's Reply Br. at 3–4.) The order seems to treat the arrangement as interest on a loan or advance rather than on an equity cushion. Whether the grant of cash collateral may be deemed a post-petition loan subject to interest payments is not a question which previous cases have addressed. *Timbers* did not address whether a post-petition grant of cash collateral based on pre-petition debt may earn post-petition interest. The court believes that the bank's view of the arrangement is the correct one and accepts its characterization as realistic. The court therefore affirms the bankruptcy court on this point.

**V.**

In the following four issues, the Committee's theme is that the Final Order of the bankruptcy court, and, in particular, its cash collateral feature, impermissibly leverages the bankruptcy process for the sole benefit of the bank. The order, the Committee urges, has created an "onerous" burden on the company and interferes with the company's fiduciary duties to other creditors. Most of the Committee's objections, the court believes, stem from the fact that this is a liquidation, rather than the rehabilitation of a going-concern, that the bank as secured creditor is (and must be) first in line for the proceeds from the liquidating company, and the unsecured creditors are fretting about whether anything will be left for them.

**A.**

■ The Committee argues that the use of the cash collateral by the company is restricted "to fund the assembly, protection, preservation and orderly liquidation of the all of its assets," and that this benefits the bank to the exclusion of the other creditors. The Committee cites cases where a going concern was open to manipulation in the bankruptcy process by a parent company, or where a going concern needed credit

---

**6.** See the immediately preceding footnote for the text of Section 363(e).

on terms necessary to preserve the assets of the company. These cases are distinguishable. Here, there is no going concern: the party's over, the company's being busted up, and the bank, as the secured creditor, is first in line ahead of the unsecured creditors.

### B.

■ There is no requirement of a carve-out in bankruptcy law, *i.e.,* a set-aside for the unsecured creditors' attorney's fees (although some Second Circuit cases show a preference for a carve-out). The Committee attempts to overcome this evident difficulty by arguing more generally for a constitutional right to attorney's fees for creditors. The rationale for a carve-out is to encourage an adversarial role for the unsecured creditors, so that they can act as watchdogs over the bankruptcy process. The bankruptcy court recognized the role of the Committee in the bankruptcy as a watchdog. But it also recognized that the value of the company is uncertain, that the company needs the bank's money; and the bankruptcy court did not want to jeopardize the bank's role in advancing the cash collateral. The court noticed that the Committee is now very much on a contingency basis, depending on whether the company's assets sell off for more than the liability to the bank. But the court did not want to fund the Committee out of what presently appears to be the bank's money. The court opined that the bank has "tremendous" leverage over the liquidation of a company that is fully indebted to the bank, and the court did not wish to take its property to pay the Committee to fulfill a watchdog role, when the Committee already has an ongoing interest in that role. (T. 165–69.) The bankruptcy court was not erroneous in foregoing a carve-out.

### C.

■ The Final Order provides for the immediate termination of the company's right to use the cash collateral in the event a trustee is appointed or the case is converted to Chapter 7. The Committee argues that this effectively entrenches management, gives the bank the ability to avoid scrutiny of other parties-in-interest, precludes creditors from redressing fraud or gross mismanagement of the company. This may have some relevance to a going concern, but not where the company is in the process of disappearing. The bank avers, moreover, that stability of management is part of adequate protection, because the current management is a known quantity, and the bank doesn't want some new party to come in and use its money. "The right to call a loan in the event of new management or ownership of the borrower is a boiler-plate provision in any well-drafted loan agreement." Bank's Br. at 26. The bankruptcy court was not clearly erroneous in granting these terms in the order.

### D.

■ The Final Order provides that the bank is secured by first priority replacement liens in "claims, causes of action, preferential transfer claims [and] fraudulent conveyance claims." Final Order 1(a) at 6. The Committee calls these "Chapter 5 Avoidance Actions" ("avoidance actions"). The Committee argues that these liens "preclud[e] the Debtor from proceeding to collect potentially the largest assets of this estate." This is because there was a leveraged buy-out involving this company in 1988, and lots of potential defendants with deep pockets were involved. (T. 43–44; Committee's Opening Br. at 40.) The Committee avers that granting these avoidance actions to the bank prejudices the unsecured creditors, because recovery on such actions might otherwise benefit the unsecured creditors. Post-petition liens, however, may be extended to avoidance actions, *see Ellingsen MacLean Oil Co.,* 98 B.R. 284, 291–92 (Bankr.W.D.Mich.1989), and the bankruptcy court was not clearly erroneous in extending the liens in this case. In addition, the bank responds that granting a lien on these avoidance actions does not mean that the avoidance actions will not benefit the unsecured creditors, nor does it preclude the bringing of actions for the benefit of the unsecured creditors.

If there is a recovery from the bank stemming from the leveraged buy-out, moreover, that recovery is exempt from the bank's lien, under the terms of the order.

In the July 22, 1991 hearing, counsel for the bank stated: "We have agreed to a carve-out of a chapter 5 fraudulent conveyance or preferential transfer with the debtor as it relates to the bank. The bank is a defendant in one of those cases and it is determined to be responsible for some kind of cause of action that the debtor may have. We have agreed to carve that out." (T. at 112.)

## VI.

The Committee argues, finally, that "[q]uite clearly, the carefully orchestrated application for use of cash collateral is nothing more than a thinly veiled mechanism for the Bank's liquidation of the Debtor's assets outside the confines and scrutiny of the creditors of this estate." Committee Br. at 42. The Committee argues violations of Sections 1125 and 1129. The Committee makes the sweeping assertion that the scope of the liquidation order is so broad that it reorganizes the company's business without compliance with Chapter 11 guidelines, and that the liquidation should instead be done through a plan of reorganization. Section 1125 mandates disclosure of "adequate information" about a bankruptcy plan sufficient to inform a hypothetical investor "typical of holders of claims or interests of the relevant class," to make an informed judgment about the plan. Section 1129 lays out the criteria for a court's approval of a plan.

As far as disclosure is concerned, the bank points out that the Final Order gives the Committee full access to the company's collateral, business operations, books and records. Final Order ¶¶ 3 & 9; Bank's Br. 27–28. More importantly, a plan is not necessary to a Chapter 11 liquidation scheme, though it may be preferable. *See In the matter of Engineering Products Co.*, 121 B.R. 246, 247, 249 (Bankr.E.D.Wisc.1990). In that case, the court ruled that in order to forego the need for a plan the bankruptcy court must (1) require an articulated business justification for sale of the assets; (2) find that the purchaser acted in good faith in the course of the sale, *i.e.*, no fraud, collusion or any attempt to take unfair advantage of other bidders; and (3) find that the purchase price is fair and reasonable, that the sale is in the best interests of the estate, and that the assets will substantially diminish in value if not immediately sold. *Id.* at 247–48. These considerations seem more appropriate where assets are being sold piecemeal, and there is some risk that the sellers may collude with the purchasers of the assets. There is no suggestion of that here. "Of paramount importance is the existence of good faith—of full disclosure and fair dealing on the part of all interested parties." *Id.* Here, the bankruptcy court required full disclosure of the company's records, etc., and while the Committee has complained about the structure of the order, there has been no suggestion of unfair dealing. The existence of the disclosure requirements ensure that the Final Order will not create a *sub rosa* plan of reorganization.

## VII.

For the reasons indicated, the judgment below is affirmed.