**In re Wayne FOERTSCH and Pamela Foertsch, Debtors.**

**Bankruptcy No. 93–30461.**

United States Bankruptcy Court, D. North Dakota.

Feb. 3, 1994.

Don R. Krassin, Wahpeton, ND, for debtors.

David L. Johnson, Fargo, ND, for Lincoln State Bank.

Wayne Drewes, Fargo, ND, Chapter 12 Standing Trustee.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Debtors' First "Amended" Plan of Reorganization (Plan) under Chapter 12 of the United States Bankruptcy Code. The Debtors, Wayne and Pamela Foertsch, filed their modified plan of reorganization on November 18, 1993. The standing Chapter 12 Trustee (Trustee) and Lincoln State Bank (Bank), the Debtors' principal secured creditor, filed objections to confirmation of the Plan. Both the Trustee and the Bank generally challenged the Plan's feasibility with the Bank further objecting to the treatment accorded its secured claim. Following the confirmation hearing, the Trustee withdrew its objection to Plan feasibility. Accordingly, it is the Bank's objections which this court must address.

A confirmation hearing was held before the undersigned on December 28 and 30, 1993. From the evidence presented, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I.

The Debtors, Wayne and Pamela Foertsch, have three dependents and have been engaged in generally a small grains farming operation for a number of years. *All* of the land the Debtors utilize in connection with their farming operation is leased on year-to-year terms from Arnold Foertsch (Wayne's father), Henry Herding, and Elsie Copeland. The leases are not evidenced by written contracts. To the contrary, the leases are based solely upon oral agreements. Over the years, the Debtors have decreased the amount of acres farmed. In 1988, they leased and farmed approximately 1,360 acres; in 1989 and 1990, 1,200 acres; in 1991, 1,000 acres; and in 1992 and 1993, they leased and farmed approximately 720 acres. The Debtors plan to continue farming the same 720 acres in the future. The land is leased and farmed on a cash rent basis according to the following terms:

Arnold Foertsch—343 acres @ $50.00 per acre.

Henry Herding—309 acres @ $60.00 per acre.

Elsie Copeland—76.7 acres @ $45.00 per acre.

Although revenues generated from farming operations constitute the Debtors' principal source of income, the Debtors have off-farm income which is derived predominantly from custom combining, janitorial work for a local church, sales of seed, and Pamela Foertsch's employment.

Presumably, in order to secure operating capital as well as equipment financing, the Debtors and Lincoln State Bank entered into a series of agreements for secured financing. Under the various financing agreements, the

Debtors granted the Bank a blanket security interest in virtually all farm machinery, equipment, vehicles, and other enumerated assets. The security agreement was signed by the Debtors on April 15, 1987 and, among other things, obligated the Debtors to pay all costs and reasonable attorneys' fees incurred by the Bank in the event of a default.[1] (Exhibit 19).

Due to circumstances which were not altogether clear to the court from the evidence in the record, the relationship between the Bank and the Debtors deteriorated. The Debtors eventually defaulted on their obligations which led the Bank to accelerate the indebtedness. On April 16, 1990, the Bank and the Debtors entered into an agreement which provided for a manner by which the entire outstanding indebtedness would be retired. By virtue of the agreement, the Debtors were to make a payment of $42,000.00 to the Bank by November 1, 1990. The remaining balance was due by December 1, 1990. The requisite funding for the remaining balance was to be derived from refinancing the outstanding obligation with another lending institution. In the event the Debtors were unsuccessful in their attempts to procure requisite financing from an alternate source, the Debtors agreed to a peaceful liquidation of the collateral securing the debt with the proceeds therefrom to be applied toward the satisfaction of the outstanding obligation. In accordance with the foregoing agreement, the Debtors agreed to reimburse the Bank for all attorney's fees and costs incurred in connection with efforts to collect the obligation.[2] (See Exhibit 14).

The Debtors did not comply with the aforementioned agreement. Consequently, the Bank brought suit against the Debtors in state court. In connection with that litigation, the Bank and the Debtors entered into a stipulation for settlement on October 25, 1991, whereby the Debtors agreed to make periodic payments and retire the debt in full by December 31, 1992, as well as agreed to pay attorney's fees and costs incurred in connection with collection efforts.[3] (See Exhibit 15).

Again, the Debtors did not comply with the settlement agreement. Consequently, the Bank obtained a judgment against the Debtors on April 6, 1993, in the amount of $146,333.02, and sought to foreclose on the collateral which secured the obligation. In order to forestall foreclosure efforts, the Debtors filed for relief under Chapter 12 of the United States Bankruptcy Code on June 2, 1993. The Bank filed a proof of claim on August 6, 1993, in the amount of $149.080.29.

The collateral that was subject to the Bank's security interest was appraised on July 8, 1993, and valued at $159,302.00. The Debtors do not dispute this value. Since the value of the collateral which secures the Debtors' obligation exceeds the Bank's prepetition claim in this case, it is clear that the Bank is an oversecured creditor.[4]

1. The Security agreement provided in pertinent part:

 11. Debtor agrees, in the event of Default, ... to pay all costs of the Secured Party including reasonable attorneys' fees, in the collection of any of the Secured Obligations and the enforcement of any of the Secured Party's rights. (Exhibit 19).

2. The attorney's fees and costs incurred by the Bank as of April 16, 1990, totalled $1,000.00.

 The agreement which in part supports the Bank's secured claim provides:
 10. Borrower shall pay *all* of the Bank's legal fees to date *and all* legal fees *incurred hereafter* through and including the date all amounts are paid to the Bank in full. This means, specifically, that in the event the Borrower is unable to refinance and the Bank needs legal help to enforce the terms of the agreement, in *any* manner, Borrower shall be obligated to pay for the Bank's attorney's fees, in addition to payment of all loan balances due and owing. (Exhibit 14, at 3 (emphasis added)).

3. The attorney's fees and costs incurred by the Bank as of October 25, 1991, totalled $3,000.00.

 Counsel for the Bank has submitted detailed schedules.which itemize the attorney's fees and costs incurred in connection with efforts to collect the obligation. The attorney's fees and costs incurred in connection with this action to date are in excess of $8,886.27. (Exhibits 16 & 17).

4. "An oversecured creditor is a holder of an allowed secured claim which is secured by collateral of greater value than the allowed secured claim." *Farmers Home Admin. v. Farmers State Bank (In re Dohn)*, 68 B.R. 282, 284 (Bankr. D.S.D.1988).

The undisputed testimony of a highly credible appraiser who examined the Bank's collateral indicated that it was in good condition and being properly maintained by the Debtors.[5] The appraiser's testimony revealed that properly maintained equipment such as that which the Debtors were utilizing in their operation experienced a 6–7% decline in value annually. By contrast, equipment that is not being properly maintained can experience a decline in value as much as 30% annually.

## II.

### A. PROPOSED TREATMENT OF LINCOLN STATE BANK'S SECURED CLAIM

The Debtors' First "Amended" Plan of Reorganization proposes to treat the Bank's secured claim in the following manner:

6. *Class VI:* Fully secured claim of Lincoln State Bank. The claim of Lincoln State Bank is fully secured and in the total approximate amount of $149,080.00. Lincoln State Bank has obtained a Judgment, and this amount is due in full at the present time. Said secured claim of $149,080.00, along with interest at a rate of 9.8% per annum, shall be paid by annual payments for five years, as follows:

 a. November 15, 1993—$15,000.00 per settlement stipulation dated August 9, 1993.

 b. December 15, 1994, and annually through December 15, 1997—$20,000.00.

 c. At termination of Plan, a balloon payment of then due and owing principal and interest.

(Exhibit 12). During the confirmation hearing, the Debtors both clarified and modified some of the Plan provisions. Specifically, the Debtors proposed to pay annual payments to the Bank in the amount of $24,250.00 for the period 1994–1997, rather than the $20,000.00 as set forth in the Plan. The final balloon payment of outstanding principal and interest is due under the Plan by January 31, 1998.

### 1.
### *Postpetition Interest, Costs, & Attorney's Fees*

The Debtors value the Bank's secured claim under the Plan as of the date of the bankruptcy filing on June 2, 1993, in the amount of $149,080.00. Although the aforementioned amount comports to the Bank's proof of claim, the Bank objected based on the Debtors' failure to provide for payment under the Plan of postpetition interest, costs, and reasonable attorney's fees.

As a general rule, the Bankruptcy Code does not permit interest to accrue on creditor claims after the filing of the bankruptcy petition. *Hanna v. United States (In re Hanna),* 872 F.2d 829, 830 (8th Cir.1989); *Lend Lease, a Division of Nat'l Car Rental Sys., Inc. v. Briggs Transp. Co. (In re Briggs Transp. Co.),* 780 F.2d 1339, 1347 (8th Cir. 1985); *In re Bradley,* 94 B.R. 563, 566 (Bankr.N.D.Iowa 1988). *See* 11 U.S.C. § 502(b)(2) (providing that upon objection to a claim, a bankruptcy court will determine the amount of the claim as of the date of the filing of the petition, and will allow the claim except to the extent that it is for unmatured interest). The United States Supreme Court long ago recognized this proposition and explained the rationale underlying the rule:

> Exaction of interest, where the power of a debtor to pay even his contractual obligations is suspended by law, has been prohibited because it was considered in the nature of a penalty imposed because of delay in prompt payment—a delay necessitated by law if the courts are properly to serve and protect the estate for the benefit of all interests involved.... Courts have felt that it would be inequitable for anyone to gain an advantage or suffer a loss because of such delay. Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that administrative inconvenience of continuous recomputation of interest causing recomputation of claims could be avoided. Moreover, different

---

**5.** Wayne Foertsch performs the vast majority of the necessary upkeep and repairs of the

collateral.

creditors whose claims bore diverse interest rates or were paid by the bankruptcy court on different dates would suffer neither gain nor loss caused solely by the delay.

*Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 163–64, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) (citations and footnote omitted). *See Hanna v. United States (In re Hanna),* 872 F.2d 829, 830 (8th Cir. 1989) ("The general rule 'disallowing' the payment of unmatured interest out of assets of the bankruptcy estate is a rule of administrative convenience and fairness to all creditors. The rule makes it possible to calculate the amount of claims easily and assures that creditors at the bottom rungs of the priority ladder are not prejudiced. . . ."). Similarly, the prevailing American rule provides that the parties themselves must generally bear the costs of their own expenses and attorney's fees in the absence of a statute or contract which calls for a different result. *In re Nordmann,* 56 B.R. 634, 636 (Bankr. D.S.D.1986) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) ); *Traylor v. Stafford (In re Stafford),* 30 B.R. 338, 340 (Bankr.E.D.Ark.1983). *Accord Caspe v. AAA–Con Auto Transport, Inc.,* 658 F.2d 613, 618 (8th Cir.1981).

Section 506(b) of the United States Bankruptcy Code creates a statutory exception to the aforementioned rules. Although the amount of a creditor's claim is fixed as of the date the bankruptcy petition is filed, § 506(b) allows an oversecured creditor to *enhance* its claim by adding to it postpetition interest and, if the agreement under which the claim arose so provides, reasonable costs and attorneys' fees:

> (b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, *and* any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b) (emphasis added). *See* H.Rep. No. 595, 95th Cong.2d Sess. 356–57 (1978); S.Rep. No. 989, 95th Cong., 2d Sess.

68 (1978); *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6312; 5854 (noting that § 506(b) codified pre–Code law that oversecured creditors' claims to reasonable fees and costs are secured claims to the degree the value of the collateral surpasses the underlying claim).

■ A plain reading of the express language of § 506(b) makes it abundantly clear that an oversecured creditor is entitled to postpetition interest on an allowed secured claim "as a matter of course". *First Bank of Dekalb County v. Faul (In re Faul),* 64 B.R. 108, 108 (Bankr.W.D.Mo.1986). Stated differently, an oversecured creditor holding an allowed secured claim has an "unqualified" right to postpetition interest, and such a right exists regardless of whether the agreement giving rise to the underlying claim contains a provision for such interest. *Rake v. Wade,* —— U.S. ——, ——, 113 S.Ct. 2187, 2189, 124 L.Ed.2d 424 (1993); *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989).

■ The postpetition interest allowed by virtue of § 506(b) continues to accrue until either the effective date of the plan, until the secured claim is paid in full, or until the extent that such interest, when added to the principal amount of the secured claim, equals the value of the collateral. *Wade,* —— U.S. at ——, 113 S.Ct. at 2189–90, & n. 4. In this regard, an oversecured creditor in bankruptcy has "a perfected security interest" in the equity cushion afforded by the value of the collateral which secures its claim. *United Savs. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 374, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988); *Abbott Bank–Thedford v. Hanna (In re Hanna),* 912 F.2d 945, 949 (8th Cir.1990) (holding that § 506(a) cannot be construed in a fashion to limit the extent of an oversecured creditor's lien in the equity cushion). *See In re Pond,* 43 B.R. 522, 523–24 (Bankr.D.N.D.1984) (recognizing that § 506(b) allows interest on a claim to continue "to accrue on that claim where the creditor was given an interest in collateral to secure its claim and that collateral is of a greater value than the creditor's claim fixed at the commencement of the bankruptcy proceedings."). While § 506(b) operates to deny oversecured creditors post-

petition interest when the equity cushion has been totally absorbed such that the amount of the claim equals the value of the collateral it secures, the statutory provision has the substantive effect of denying unsecured or undersecured creditors, who by definition have no equity cushion, postpetition interest on their claims. *United Savs. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372–73, 108 S.Ct. 626, 631, 93 L.Ed.2d 740 (1988). *See Unsecured Creditors' Comm. v. Jones Truck Lines, Inc. (In re Jones Truck Lines),* 156 B.R. 608, 613 (Bankr.W.D.Ark.1992).

The rationale for permitting the accrual of postpetition interest to the extent that a claim is oversecured rests upon the fact that no unfairness to other creditors will result when accrued interest is assessed only against property which is already encumbered by a specific claim:

> [T]he interest provisions of the Code and its predecessors, as interpreted by the Supreme Court for almost a century, are premised on the equitable principle that the unencumbered assets of a debtor's estate will not be used to benefit one class of creditors at the expense of another class. Such would be the case if unencumbered assets, otherwise available for the payment of unsecured claims, were used to pay postpetition interest on undersecured debt. Allowing a claim for postpetition interest by an oversecured creditor, on the other hand, is not inconsistent with that equitable principle, because only assets encumbered by the creditor's lien will be used to fund the payment of postpetition accrued interest.

*United Savs. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 793 F.2d 1380, 1387 (5th Cir.1986), *aff'd on rehearing en banc* 808 F.2d 363 (1987), *aff'd sub nom. United States Savs. Ass'n v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Moreover, permitting an oversecured creditor whose lien arose from a consensual transaction to recover postpetition interest up to the point when interest together with principal equal the value of the collateral securing the debt,

generally affords that creditor with merely the benefit of the bargain:

> In ... circumstances [where] the creditor's security interest arises from a voluntarily executed agreement between the debtor and the creditor[,] [t]he two parties have bargained with reference to a specific security with the expectation that the creditor may sell this security and realize the entire amount of the outstanding obligation including interest accrued to the date of payment. To deny such a creditor postpetition interest, when the amount of the security is sufficient to cover both the principal and interest due, would undermine the faith of lenders in the efficacy of credit arrangements. Such a loss of confidence could result in a curtailing of the free flow of capital in our economy. Thus, granting postpetition interest to [secured lenders] ... satisfies the expectations of the parties and strikes an equitable balance between the creditors and debtors.

*In re Boston & Maine Corp.,* 719 F.2d 493, 497 (1st Cir.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984) (citations omitted).

In determining the "amount" of postpetition interest under § 506(b) *only,* this court follows the view of the majority courts which hold that such interest should be computed at the "contract rate" under which the claim arose *up to the point* where the aggregate claim equals the value of the security. 3 *Collier on Bankruptcy* ¶ 506.05, at 506–46–48.1 (15th ed.1993); 2B *Bankruptcy Service* § 21:253, at 8–9 (L.Ed.1988). *See Ford Motor Credit Co. v. Johnston (In re Johnston),* 44 B.R. 667, 669 (Bankr.W.D.Mo.1984) (quoting 8A C.J.S. *Bankruptcy* § 422, at 857 (1962)) (the "contract rate" is the applicable rate of postpetition interest to be accorded an oversecured creditor in bankruptcy: " 'If it is legal, the rate of interest allowable is usually that which the bankrupt has agreed to pay.' "). Thereafter, the "market rate" of interest is generally the benchmark by which postpetition interest becomes payable under a plan of reorganization. *American Bank v. Coburn (In re Coburn),* 36 B.R. 550, 551 (Bankr.W.D.Mo.1983). Calculating postpetition interest at the contract rate further pre-

serves benefit of the bargain principles as enumerated above, and to a certain extent compensates an oversecured creditor for its "lost opportunity" cost or for a "delay in enforcement" of its rights. *First Bank of Dekalb County v. Faul (In re Faul)*, 64 B.R. 108, 109 (Bankr.N.D.Ill.1986).

The United States Supreme Court has ruled that under 11 U.S.C. § 506(b), "an oversecured creditor is *always* entitled to *interest* on its claim, and *may* be entitled to *those expenses which the agreement provided.*" *In re Smith*, 125 B.R. 240, 242 (Bankr. W.D.Mo.1991) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ). It should be noted, however, that § 506(b) should be generally interpreted to provide only for those costs and fees which an oversecured creditor *actually* incurs. *In re Kroh Bros. Dev. Co.*, 88 B.R. 997, 1001 (Bankr.W.D.Mo.1988). Although § 506 refers only to "fees", it is well established that under 11 U.S.C. § 506(b) an oversecured creditor is entitled to add, among other things, *reasonable attorney's fees* to the value of its claim *if* the underlying agreement between the parties provides for the collectability of such fees. *Farmers Home Admin. v. Farmers State Bank (In re Dohn)*, 68 B.R. 282, 284 (Bankr.D.S.D.1988); *Traylor v. Stafford*, 30 B.R. 338, 340 (Bankr. E.D.Ark.1983).

An oversecured creditor must carry the burden and satisfy three fundamental requirements before it is entitled to enhance its claim by adding to it attorney's fees: "(1) prove that it is oversecured in excess of attorney's fees requested; (2) prove that its fees are reasonable; and (3) prove that the agreement underlying the claim provides for attorney's fees." *In re David N. Rausch, Inc.*, 41 B.R. 833, 834 (Bankr.D.S.D.1984); *In re Nordmann*, 56 B.R. 634, 636 (Bankr. D.S.D.1986). It is undisputed that the Bank in this case is oversecured in the approximate amount of $10,221.71. Further, the underlying security agreement as well as the *two* subsequent agreements clearly provide for the payment by the Debtors of all costs and reasonable attorney's fees incurred by the Bank in connection with the collection of the obligation.

The "reasonableness" requirement that § 506(b) expressly imposes, operates as a limitation upon the amount of contractually agreed upon attorney's fees a bankruptcy court may properly award an oversecured creditor. *In re Nicfur–Cruz Realty Corp.*, 50 B.R. 162, 167 (Bankr.S.D.N.Y.1985). Courts have found attorney's fees incurred by a creditor to be inherently unreasonable if they are not cost-justifiable either by the economics of the situation or necessary in order to preserve the creditor's interests in light of the legal issues of the case. *See id.* at 169. The Bank's supporting documentation clearly summarizes and itemizes attorney's fees incurred postpetition in connection with enforcing the obligation in the instant matter. (Exhibit 16). The pertinent contractual language in the security agreements as well as subsequent agreements clearly does cover and permit the allowance of reasonable attorney's fees and costs. An independent review of the detailed description of the services rendered leads the court to easily conclude that the fees incurred were both reasonable and within the scope of the services covered by a reasonable interpretation of the provisions of the applicable agreements.

Section 506(b) entitles the Bank as the holder of an oversecured claim to recover postpetition interest and reasonable attorney's fees in addition to the prepetition amount of its claim.[6] The Debtors' Plan readily acknowledges that the Bank's claim is "fully secured". As a fully secured creditor, the Bank is entitled by law to the benefits afforded such creditors by virtue of § 506(b). Based upon the aforementioned analysis, the court concludes that the Plan the Debtors propose is deficient in that it fails to provide the Bank with the full value of its secured claim.

6. Based upon the evidence before the court, the attorney's fees and costs incurred by the creditor in connection with the Debtors' obligation are in excess of $8,886.27. (Exhibits 16 & 17). When combined with the contract rate of interest, it can be readily concluded that the value of the Bank's secured claim is equal and limited to the appraised value of the collateral.

## 2.

### *Interest Rate*

 The Bank in its objection to confirmation asserts that the 9.8% fixed rate of interest that the Debtors propose to pay per annum over the life of the Plan is unsatisfactory in that it does not reflect an interest rate that the market would impose upon an obligation of similar terms and risk. This rate, the Bank maintains, does not afford it the present value of its allowed claim.

The United States Constitution, the Bankruptcy Code, and case law clearly establish that a secured creditor in bankruptcy is entitled to the full value of its allowed claim. *In re Kloberdanz,* 83 B.R. 767, 770 (Bankr. D.Colo.1988). Section 1225(a)(5)(B) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization over the objection of a secured creditor if the plan provides that the creditor will retain the lien securing its claim and will receive a value, as of the effective date of the plan, that is not less than the allowed amount of its claim. 11 U.S.C. § 1225(a)(5)(B). This subsection allows a farm debtor to "cram down" a plan of reorganization onto the holder of an allowed secured claim in situations in which the creditor refuses to accept the proposed plan, provided that, among other things, the value of the secured creditor's claim is demonstrably preserved. *See In re Fenske,* 96 B.R. 244, 248 (Bankr.D.N.D.1988).

In order for a secured creditor to receive a value that is at least equal to the allowed amount of its claim as of the effective date of a plan, the payments provided under a plan of reorganization must be discounted by an appropriate rate of interest, thus providing the creditor with the present value of its claim. *In re Edwardson,* 74 B.R. 831, 835–36 (Bankr.D.N.D.1987). Stated differently, when a debtor's plan of reorganization proposes to pay the holder of a secured claim in deferred installments, the value of the proposed payments must not be less than the allowed amount of the secured claim. Accordingly, a discount factor must be applied to the proposed stream of payments in order to determine the present value of those payments. The discount rate, or interest rate, must be ascribed to the allowed amount of the secured claim at a specified rate and must be paid under the plan along with the principal because money received later in the future is worth less than money received immediately in the present. 5 *Collier on Bankruptcy* ¶ 1225.03, at 1225–23 (15th ed. 1993); *id.* ¶ 1129.03, at 1129–99 ("The concept of 'present value' is of paramount importance.... Simply stated, 'present value' is a term of art for an almost self evident proposition: a dollar in the hand today is worth more than a dollar to be received a day, a month or a year hence."). Through the payment of an appropriate rate of interest, a secured creditor is compensated for the delay in receiving the amount of the allowed secured claim:

> "The purpose of the present value requirement is to place the holder of an allowed secured claim in the same position; economically as if the debtor exercised the option of surrendering the collateral. Through the payment of interest, the creditor is compensated for the delay in receiving the amount of the allowed secured claim which would be received in full immediately upon confirmation if the collateral were liquidated and the capital returned to the creditor's lending business."

*Confederation Life Ins. Co. v. Beau Rivage Ltd.,* 126 B.R. 632, 638 (D.N.D.Ga.1991) (quoting *In re Corley,* 83 B.R. 848, 850 (Bankr.S.D.Ga.1988)).

 The United States Supreme Court has long recognized the right of a secured creditor to have the value of its claim "substantially preserved" over time through the payment of adequate interest. *In re Kloberdanz,* 83 B.R. at 770 (citing various Supreme Court decisions). The receipt of an appropriate rate of interest assures a secured creditor full payment of its allowed claim over time. *In re Konzak,* 78 B.R. 990, 992 (Bankr.D.N.D.1987). Although not meant to operate as a *per se* rule in each and every case, the majority of decisions, including those of this court, have established that the appropriate rate of interest is generally determined in accordance with the *market rate:*

> "The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the

risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default." *United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989) (quoting various authorities). *See United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986) (holding that the sole reliance on a creditor's "cost of borrowing without consideration of the risk of nonpayment, the length of the payment period, and the existence of collateral is clearly contrary to the prevailing market rate approach referred to [previously by this court] and adopted by other courts that have considered the issue. . . ."); *Prudential Insur. Co. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1339 (8th Cir.1985); *Hardzog v. Federal Land Bank (In re Hardzog),* 901 F.2d 858, 860 (10th Cir.1990) ("Chapter 12 is predicated upon the theory that the lender is making a new loan to the debtor. It therefore follows that the most appropriate interest rate is the current market rate for similar loans made in the region at the time the new loan is made. This approach should also tend to assure that both the lender and the debtor are treated fairly with neither receiving an advantage over the other."). *See also In re Rott,* 94 B.R. 163, 168 (Bankr.D.N.D. 1988); *In re Fenske,* 96 B.R. 244, 248 (Bankr. D.N.D.1988); *In re Konzak,* 78 B.R. at 992 (opining that "[g]enerally, the best evidence of what a reasonable discount rate is for a given principal, term and risk, is the rate the creditor involved would charge the debtor for such a loan in the marketplace absent the event of bankruptcy."); *In re Edwardson,* 74 B.R. at 836; *NCNB Texas Nat'l Bank v. Hulen Park Place, Ltd. (In re Hulen Park Place, Ltd.),* 130 B.R. 39, 42 (Bankr.W.D.Tex. 1991) ("The preferred method of determining the appropriate market rate is the coerced loan theory, to wit: the rate that regional lenders on similar loans would actually charge persons similarly situated to the debtor on the open market, absent the fact of bankruptcy, considering the term of the loan, the amount and quality of the collateral, and other risk factors."); *In re Claeys,* 81 B.R. 985, 993 (Bankr.D.N.D.1987) (opining that the interest rate should be determined by what a similar loan to debtors under similar circumstances would cost in the marketplace). *See generally,* Scott L. Sanders, Comment, *Plan Confirmation Under Section 1225 of the Bankruptcy Code: Sowing the Seeds of Inconsistency,* 8 Bankr.Dev.J. 291, 310–14 (1991). *But see In re Computer Optics,* 126 B.R. 664, 670–72 (Bankr.D.N.H. 1991) (rejecting the "coerced loan" theory). A discount rate based upon a market rate formula should even be applied where the market rate of interest may happen to be substantially "higher" than that rate of interest provided for under the original contract. *See United States Dept. of Agric. v. Fisher (In re Fisher),* 930 F.2d 1361 (8th Cir.1991).

■ The United States Court of Appeals for the Eighth Circuit has concluded that a determination of what discount or interest rate will provide a creditor with the present value of its claim is a factual inquiry that must out of necessity be made on a case-by-case basis. *United States v. Doud,* 869 F.2d 1144, 1146 (8th Cir.1989). The Debtors in this case propose to pay the Bank an annual interest or discount rate of 9.8% fixed over the five year life of the Plan, with a balloon payment at the expiration of the Plan to retire the obligation in full. The Debtors readily concede that this rate of interest is the approximate *contract rate* as originally bargained between the parties in 1987. (Debtor's Post–Trial Memorandum, at 4). Other than drawing the court's attention to the fact that established yields for "risk-free" treasury bills or bonds maturing at the end of the Plan are apparently less than the 9.8% rate being accorded the Bank under the Plan, the Debtors wholly failed to offer any substantial evidence in support of the reasonableness of the 9.8% rate. Squarely on point with what the Debtors seem to be intimating by introducing evidence of treasury bond yields is the decision of *In re Claeys,* 81 B.R. 985 (Bankr.D.N.D.1987), where this court opined:

> Although some bankruptcy courts have used the yield on a Treasury Bond together with a risk enhancement factor, this court believes the best evidence of what a discount rate ought to be is what a similar

loan to a debtor in similar circumstances would cost in the marketplace. It seems that a creditor's own testimony as to what it would charge for a loan under a given set of circumstances best reflects upon each of the required inputs. Using the Treasury Bond rate as the base rate and then factoring in an adjustment which the court believes is compensatory of the risks involved seems arbitrary and unnecessary particularly in those cases in which as here a lender has introduced testimony on the very issue.

*In re Claeys,* 81 B.R. 985, 993 (Bankr.D.N.D. 1987). The Debtors failed to adequately challenge credible countervailing testimonial evidence which established that the current market rate of interest for a similar fixed-rate loan with similar risk in this region was 12% per annum. Similarly, the Debtors failed to establish to this court's satisfaction that the rate of interest proposed under the Plan of 9.8% is an accurate reflection of the current market rate for a loan of similar risk and terms.

The uncontested testimony of the Bank's loan officer, who had twelve years of banking experience and had himself been engaged in farming for fifteen years, revealed that new farm chattel loans were generally amortized over a maximum period of 6 to 7 years. Moreover, balloon payments, such as that which the Debtors were proposing, were not "scheduled" by the Bank on similar loans because of the increased risk of default associated with such loans.

There was substantial evidence presented by the creditor's expert that the collateral such as that which was securing the Bank's claim depreciates in value at an annual rate of 6–7% until it reaches salvage value even if it is properly maintained. A much more rapid rate of decline in value would be experienced if the Debtors did not properly maintain the collateral. The court must be cognizant of the depreciating value of the Bank's collateral, as well as the Debtors' history of breach and nonperformance under a number of previous agreements which provided for terms similar to those which the Debtors are currently proposing, when assessing the risk of an essentially "coerced loan" as contemplated by the Plan.

Based upon the evidence before the court, this court believes that the Bank's secured claim should be amortized at a fixed rate of 12% in this case because it is reflective of the market rate for fixed-rate loans of similar term and quality in this region. The 9.8% interest as proposed by the Debtors in their Plan does not give the Bank the present value of its secured claim as required by the dictates of 11 U.S.C. § 1225(a)(5)(B).

## B. FEASIBILITY

The Bank further objects to the confirmation of the Debtor's Plan on the grounds that it is not feasible. The feasibility requirement of Chapter 12 emanates from § 1225(a)(6) of the Bankruptcy Code which provides that a court shall confirm a plan of reorganization if "the debtor will be able to make all payments under the plan to comply with the plan." 11 U.S.C. § 1225(a)(6). This "feasibility" standard is a test also found in both Chapters 11 and 13, and requires a court to scrutinize the debtor's plan payments in light of projected income and expenses in order to determine whether the debtor is likely to be able to make the payments in accordance with the plan provisions. *Prudential Ins. Co. v. Monnier (In re Monnier),* 755 F.2d 1336, 1341 (8th Cir.1985) (quoting *United Properties, Inc. v. Emporium Dept. Stores, Inc.,* 379 F.2d 55, 64 (8th Cir.1967)) (" "[i]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." "); *In re Anderson,* 52 B.R. 159, 162–63 (Bankr. D.N.D.1985). The feasibility test "injects pragmatism into the confirmation process by prohibiting confirmation of overly optimistic reorganization plans clearly destined to fail and by not belaboring the inevitable demise of a hopelessly insolvent debtor." Richard M. Cieri, et al., *"The Long and Winding Road": The Standards to Confirm a Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Part II),* 3 Bankr. Law and Practice 115, 151 (1994).

 Feasibility is fundamentally a fact question since it necessarily depends upon a determination of the reasonable probability of payment. *In re Crowley*, 85 B.R. 76, 78 (D.W.D.Wis.1988). The feasibility requirement embodied in 11 U.S.C. § 1225(a)(6) does not require an "iron clad guarantee". Projecting future income and expenses can never be an exact science especially in farming where an operation is highly susceptible to vicissitudes in the weather and economy. As such, a debtor's plan need not guarantee success. *In re Monnier*, 755 F.2d at 1341. The determination of feasibility cannot, however, be made in an "evidentiary vacuum", but must be "firmly rooted in predictions based on objective fact." *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985); *In re Konzack*, 78 B.R. 990, 994 (Bankr.D.N.D.1987). As set forth by the United States Court of Appeals for the Eighth Circuit, plan feasibility contemplates:

> "[T]he probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make the plan feasible and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."

*In re Clarkson*, 767 F.2d at 420 (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Fenske*, 96 B.R. 244, 249 (Bankr.D.N.D.1988). In short, the court must be persuaded that it is *probable* that a plan will be able to cash flow, not merely technically *possible* for it to do so:

> It does no one any good to blindly confirm either a plan or later modification that is incapable of cash flowing. To confirm such a plan would shortly result in default and to approve such a modification would result in a merry-go-round of annual modification due to failed projections. Results as these are not within the intent of Congress.

*In re Dittmer*, 82 B.R. 1019, 1022 (Bankr. D.N.D.1988). The United States Supreme Court, in an early decision under Section 77B of the Bankruptcy Act recognized that "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the ... Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936).

 When construing feasibility requirements, this court gives Chapter 12 debtors the benefit of the doubt and will reasonably resolve conflicts in the evidence in the debtor's favor "when the debtor's projections, using reasonable inputs in light of the current economic climate, indicate that it is reasonably probable that the debtors will be able to make the plan payments." *In re Rott*, 94 B.R. 163, 169 (Bankr.D.N.D.1988) (citing *In re Konzak*, 78 B.R. 990, 993 (Bankr.D.N.D.1987)). *See In re Hagen*, 95 B.R. 708, 712 (Bankr.D.N.D.1989). This inclination to give debtors the benefit of the doubt flows logically from the recognized purposes underlying the enactment of Chapter 12. However, the burden is upon the Debtors to adequately demonstrate the viability of the proposed Plan, and the court will not give judicial gloss to stark financial realities. *See Fenske*, 96 B.R. at 248 (opining that "[a] debtor presenting a Chapter 12 plan bears the burden of proving that the proposal is both realistic and will cash flow."); *In re Kuether*, 158 B.R. 151, 153 (Bankr.D.N.D. 1993).

In assessing the feasibility of the Debtors' Plan, the court finds the historical financial data of the Debtors' operation to be highly instructive, especially when measured against the projections under the Plan:

*a. Actual "Crop" Income—Historical Performance*

| Year | Gross Crop Income | Aprx. Acres Farmed | Income Per Acre |
|---|---|---|---|
| 1988 | $141,813 | 1,360 | $104.27 |
| 1989 | $137,056 | 1,200 | $114.21 |
| 1990 | $157,993 | 1,200 | $131.66 |
| 1991 | $150,848 | 1,000 | $150.85 |
| 1992 | $ 69,222 | 720 | $ 96.14 |
| 1993 | $ 26,656 | 720 | $ 37.02 |

### b. Projected "Crop" Income Under Plan

| Year | Gross Crop Income | Acres Farmed | Income Per Acre |
|------|------------------|--------------|-----------------|
| 1994 | $146,400 | 720 | $203.33 |

(See Exhibits 3 & 7).

This court is not confronted with a situation where the Debtors' farming operation will undergo significant changes. To the contrary, the Debtors in this case will be farming the same land, planting substantially similar crops, and generally conducting their farming operation in much the same fashion as in previous years. Although projections are just that and there will always be a degree of uncertainty as to what actual results will be, feasibility must be predicated upon objective facts. In re Oster, 152 B.R. 960, 964 (Bankr.D.N.D.1993); In re Dittmer, 82 B.R. 1019, 1023 (Bankr.D.N.D.1988) (opining that projections must be based upon actual experience). In the case at bar, the aforementioned numbers clearly demonstrate that over the last six years, the Debtors have historically never been able to even come close to producing the level of crop income that they now project under the Plan and readily concede is necessary in order for the Plan to cash flow.[7] The basis for the heightened level of projected crop income was virtually unexplained by the Debtors. As such, the projections are not reconcilable and appear overly optimistic. This court has denied confirmation of a debtor's plan of reorganization where projected crop yields or income are inconsistent with historical performance:

A debtor should not premise future plan cash flows upon heightened yield or market data for successive plan years unless there is some objective base for such data. The plan must, to the extent possible, be based on known inputs including yields [and income] as presently existing. No one can predict what prices will be in the future and it is folly to peg feasibility upon future yields and market prices which are at best often unpredictable and at worst even imaginary.... [T]estimony should be based on historical production figures....

In re Konzak, 78 B.R. 990, 994 (Bankr. D.N.D.1987); In re Crowley, 85 B.R. 76, 79 (D.W.D.Wis.1988). Although the court is mindful that weather conditions over a number of the past years have been less than optimum, there is nothing before the court which permits the conclusion that the projected crop income is even within the realm of probability even when compared to actual 1991 financial data, a year which has been hailed by the Debtors to be a so-called "normal year". See generally In re Ziebarth, 113 B.R. 591, 596 (Bankr.D.N.D.1990) (noting that "[w]hile the court is aware of the drought situation in western North Dakota for the last two years, a debtor must be mindful that a plan of reorganization must strive to be feasible not only in good years but also in poor years.").

Although it was conceded that projected off-farm income of $24,500.00 was critical to the Plan's success, the Debtors incorporate projections of off-farm income into Plan computations at "gross" amounts. Any provision for social security or withholding taxes was to be apparently absorbed by and subtracted from the meager $18,000.00 that was allotted for the family of five to live on.

Without performing a line-by-line analysis herein, an examination of a "number" of essential expense items as projected in the Plan seem simply unrealistic when gauged against historical figures. For example, actual repair and maintenance expenses associated with the upkeep of the Bank's collateral over the last six years were substantially higher than what the Debtors are currently projecting:

---

7. Even if the Debtors' actual crop income is augmented by government insurance payments which compensated the Debtors for crop damage in 1992 and 1993 in the amounts of $49,049.00 and $42,168.00 respectively, the actual numbers simply don't mesh with what the Debtors now project under their Plan. (1992: $69,222.00 (Actual Crop Income) + $49,049.00 (Government Insurance Payment) = $118,271.00/720 = $164.27 (Income Per Acre); 1993: $26,656.00 (Actual Crop Income) + $42,168.00 (Government Insurance Payment) = $68,824.00/720 = $95.59 (Income Per Acre)).

"Actual" Repair & Maintenance Expenses:
1988: $12,205.00
1989: $18,343.00
1990: $16,599.00
1991: $16,376.00
1992: $13,502.00
1993: $15,174.00

"Projected" Repair & Maintenance Expenses:
1994: $8,000.00

---

(Exhibits 3, 4, & 5). Given the aged line of equipment, the court is not persuaded that the projected repair and maintenance expenses are justifiable. Although concededly the Debtors have in recent years decreased the number of acres that they have been farming and an apparent floating reserve is also set aside for repairs, the Debtors hope to be increasing their custom combining operation in order to augment off-farm income. Furthermore, the testimony revealed that the Debtors' combine is in need of "major" repairs or even needs to be replaced. The Debtors have failed to demonstrate to the court's satisfaction that a number of the expense items, such as repairs and maintenance, will be markedly different than what they have historically been.

Even the Debtors' own expert appeared less than confident in Plan's ability to cash flow based upon the Plan projections as presently constituted. The ability of the Plan to cash flow becomes even more problematic and fraught with difficulty when the discount rate of 12% is employed for calculating the annual payments due the Bank, and when the Bank's secured claim is enhanced by postpetition interest, costs, and attorney's fees to the value of the collateral.

The hard facts do not lend credence to the Debtors' cash crop income or expense projections upon which their Chapter 12 Plan of Reorganization is based. Accordingly, the court is of the view that the Debtors' First "Amended" Plan of Reorganization simply does not meet the feasibility requirement of 11 U.S.C. § 1225(a)(6).

### III.

Additionally troublesome is the fact the Plan requires the Bank's secured claim is to be paid off via a balloon payment at the end of the five-year life of the Plan, yet the Debtors have no prospects whatsoever for obtaining a commitment of the funds with which to finance the payment. The Debtors simply contend that they believe financing can be obtained at the end of the Plan's life. A plan of reorganization must be more than a mere visionary scheme based upon "pie-in-the-sky" notions of what the future will bring. Moreover, obviously critical to the Debtors' farming operation is the land which they farm. Yet, the Debtors are significantly in the arrears with two of the lessors and provide no basis for treating their claims under the Plan other than to treat them as general unsecured creditors. As the leases are based simply upon mere oral agreements and essentially subject to termination at will, there is no realistic assurance that the Debtors will be able to continue farming the very land that is necessary to the viability of the current Plan.

### IV.

For the aforementioned reasons, **IT IS ORDERED** that confirmation of the Debtors' First "Amended" Plan of Reorganization under Chapter 12 of the United States Bankruptcy Code is in all things **DENIED.**

**SO ORDERED.**